STATE OF CONNECTICUT *v.* KEVIN DAHLGREN
(11847)

STATE OF CONNECTICUT *v.* JAMES OLDREAD
(11956)

PETERS, C. J., HEALEY, SHEA, DANNEHY and SANTANIELLO, Js.

Argued March 11—decision released July 22, 1986

*G. Douglas Nash,* assistant public defender, with whom, on the brief, was *Joette Katz,* public defender, for the appellants (defendant in each case).

*Eric I. B. Beller,* special assistant state's attorney, with whom were *John M. Massameno,* assistant state's attorney, and, on the brief, *Eugene J. Callahan,* state's attorney, and *David I. Cohen,* assistant state's attorney, for the appellee (state).

ARTHUR H. HEALEY, J. The defendants, Kevin Dahlgren and James Oldread, were jointly tried before a jury on various charges arising out of the abduction of an eighteen year old woman in Norwalk on November 14, 1981.[1] Both defendants were found guilty of larceny in the third degree in violation of General Statutes § 53a-124 and larceny in the first degree in violation of General Statutes § 53a-119. The defendant Dahlgren was also found guilty of kidnapping in the first degree in violation of General Statutes § 53a-92 (a) (2) (A), and the defendant Oldread was found guilty of the lesser included offense of kidnap-

---

[1] Both defendants were acquitted of the charges of conspiracy to commit kidnapping in the first degree, conspiracy to commit robbery in the second degree, and conspiracy to commit larceny in the first degree. General Statutes § 53a-48 (a).

ping in the second degree in violation of General Statutes § 53a-94 (a).[2] Both defendants were sentenced to the custody of the commissioner of correction for an effective term of twelve years. The defendants appeal the judgments of conviction.

The defendants raise two of the same issues on appeal: (1) whether the trial court's instructions on kidnapping in the first degree effectively enlarged the crime charged in violation of their constitutional rights; and (2) whether the trial court's ruling on certain questions to be put to prospective jurors prior to the jury voir dire violated the defendants' statutory or constitutional rights. The defendant Dahlgren also raises as an issue on appeal whether the court's instructions to the jury on intent to violate and abuse sexually, as an element of kidnapping in the first degree, effectively directed a verdict of guilty in violation of his constitutional rights. We find no error.

The jury could have reasonably found the following facts: On Friday night, November 13, 1981, the victim D and her friend C arrived at the Oaks Tavern in Norwalk in C's two door 1977 Pontiac Trans Am. While there, C met the defendants and spoke with both of them. At closing time, around 2 a.m., D left the tavern and joined C at her car in the parking lot. C was talking to the defendants and a male friend, and D was then introduced to the defendants for the first time. After talking for a while, the defendants asked for a ride to their car which was allegedly parked on a nearby street. The five people got into the car and C drove to the nearby street but they were unable to find the defendants' car. C then drove to the male friend's house in

---

[2] Both defendants had also been charged with two counts of sexual assault in the first degree and the defendant Dahlgren had been charged with attempted sexual assault in the first degree. The defendants' motion to dismiss was granted without prejudice as to these counts, pursuant to Practice Book § 819, by the trial court, *Landau, J.*

Norwalk and dropped him off. When C remarked about their inability to find the defendants' car, Dahlgren grabbed her around the neck. C then drove D to her home but D did not want the defendants near her home and suggested that C drive them to their car near the tavern. On their way back to the tavern, C stopped at a parking lot at Norwalk State Technical College. C got out of the car and proceeded to the nearby woods in order to relieve herself. Dahlgren, who had been in the back seat with D, got out of the car and began following C. He returned, however, to the car, got into the driver's seat, and drove out of the parking lot. D was alone in the back seat of the two door car and Oldread was in the front passenger seat. Dahlgren was driving in an erratic manner and D attempted to stop the car by reaching for the key in the ignition and by trying to push the stick shift into park. Oldread, however, pushed her into the back seat. D then threatened him by holding a bottle over his head and he punched her in the face, causing a black eye and a bloody nose. C, who had seen the defendant drive her car out of the parking lot, walked to the street looking for a telephone when a police officer in a squad car stopped, and she reported that her car had been taken.

Dahlgren drove onto Interstate 95 heading for New York. D continued to struggle but was hit several times. When she asked why the defendants had taken her, Oldread replied that they wanted "to party" and one stated that it was "because of [her] body." Oldread then took sixty dollars from D's wallet. Sometime after the car had passed Stamford, D fell asleep in the back seat.

When D awoke, Oldread was now driving on a highway D did not recognize and Dahlgren was in the front passenger seat. Dahlgren climbed into the back seat, ordered D to remove her clothing, and sexually assaulted her twice. They stopped at least twice for gas before reaching Buffalo, New York, where they went to vari-

ous places, including the homes of the defendants' friends. At each location where they stopped, at least one of the defendants remained with D in order to prevent her escape. The defendants then drove D to the airport where they bought her an airplane ticket to New York City. After they had left D at the airport, the defendants drove the car over a curb and when they were unable to unjam the gears, they abandoned the car at a gas station. As soon as the defendants left her to board the plane, she located a police officer and reported that she had been kidnapped and that her friend's car had been stolen. After arriving at LaGuardia Airport, where she was met by her father and a police officer, she was immediately taken to Norwalk Hospital for examination and treatment.

## I

Both the defendants claim that, because of the crime charged in the amended information and specified in the bill of particulars, the trial court's instructions on kidnapping in the first and second degrees effectively enlarged the crime charged in violation of their constitutional rights. Under General Statutes § 53a-91 (2), abduct "means to restrain a person with intent to prevent his liberation by either (a) secreting or holding him in a place where he is not likely to be found, or (b) using or threatening to use physical force or intimidation." By an amended motion for a bill of particulars, Dahlgren had asked, inter alia, for additional information concerning the nature of the abduction. The state complied and stated that the abduction was accomplished by "using physical force or intimidation" and the means of restraint was by "moving her from one place to another." The defendants claim that their defense focused on the allegations charged in the amended bill of particulars and that if they had been charged with both alternative definitions of "abduct," as that term is set out in General Statutes § 53a-91,

they would have presented "a different and more extensive defense." The amended information filed in each case and dated October 4, 1982, stated that the defendant "did abduct one [D] by restraining her or by moving her from one place to another *with intent to prevent her liberation by using physical force or intimidation,* with intent to violate and abuse her sexually in violation of section 53a-92 (a) (2) (A) of the Connecticut General Statutes." (Emphasis added.)

The trial court included both of the statutory alternative definitions of abduction and restraint in its original instructions to the jury on the elements of kidnapping in the first degree. At the conclusion of the jury instructions, the defendant Dahlgren, joined by the defendant Oldread, excepted to the court's inclusion of the alternative definitions of restraint and abduction.[3] After the defendant Dahlgren had finished stating his sixteen exceptions, which the defendant Oldread adopted, but before the jury returned to the courtroom, the trial court sought to clarify the defendants' request

---

[3] The defendant orally made the following exception to the court's charge on kidnapping:

"Your Honor defined restrain for the Jury and I noted at that time that that instruction was given that The Court gave alternative means, both for the definition of restraint and the definition of abduction as is provided in the Statute. However, I had requested in the bill of particulars that the State make more particular the information, and the only definition part of the Statute that the State was alleging and unfortunately did not get into the amended information that The Court had, dated October 4th, 1982, was that the abduction and restraint occurred by moving her from one place to another. And that secreting or concealing, which was part of the Court's charge is in fact not within the scope of the pleadings here, not within the scope of the bill of particulars, and I would ask that The Court really inform the Jury that they can only consider moving from one place to another, that if they consider secreting or concealing, that is outside the scope of the information. In fairness to The Court, your Honor did ask whether he had the most recent information, and we did indicate that you did. And again, it did not become apparent to me until, as you were going through the charge and you instructed in the alternative on the Statute, that, in fact, that language was missing from the amended information."

to charge on restraint. Dahlgren's counsel agreed that the manner of restraint alleged in the bill of particulars was that the victim had been moved from place to place. Before the jury had begun any deliberations, the trial court reinstructed them pursuant to the defendants' exception that they were only to consider whether restraint had been accomplished by moving D from one place to another and that they were not to "seek out, through the evidence, any basis to find that she was concealed anywhere."[4] The court made

---

[4] The trial court reinstructed the jury on kidnapping as follows:

"The State is limiting itself in the Statute concerning kidnapping with the manner in which the kidnapping occurred, in that, it is their claim that the restraint, that is, you must find, remember kidnapping is an abduction and restraint and for purposes of kidnapping in the first. And in the Statute I read to you, I read it to you in the alternative. I said restrain means to restrict a person's movements intentionally and unlawfully, in such a manner as to interfere substantially with his liberty by moving her from one place to another, or, by confining her either in a place where the restriction commences, or in a place which she has been moved without consent. The State has made an election in the—during the course of the pendency of the case, in response to a motion by the Defendants. That the manner in which this restraint was accomplished is solely, and the only one you're to consider, is by moving her from one place to another, so don't rely nor would the defense have defended on the basis of confining her either in a place where the restriction commenced or in a place to which she had been removed without consent.

"So that you're only going to consider, has the State proven, beyond a reasonable doubt, and put forward evidence for you to find to that extent that the victim, [D], was restrained in a manner from moving her from place to place. You have to just consider that evidence, and you won't have to seek out, through the evidence, any basis to find that she was concealed anywhere. And you will use that definition in restraint wherever it comes into play, on the kidnapping first, kidnapping second, and the unlawful restraints.

\* \* \*

"But I'm going to remove from your consideration the concealment, because, as I view the evidence, and my charge is tailored to the view of the evidence, whether it's acceptable or not is immaterial. The charge is devoted toward trying to give you a full picture of your function in respect to what has been produced.

"If there is flight at all, it occurred at the time at the Buffalo Airport, at which time [D] separated from the Defendants. So, there is no way of

it clear to the jury that the state had made an election, in response to a defense motion, that insofar as the abduction and restraint aspect of the kidnapping charge was concerned, the charge had been limited to "moving [the victim D] from one place to another" and not to "confining her . . . ." The defendants did not except to this revised instruction which apparently satisfied them. The revised instruction cured any error that may have resulted from the initial instructions on the definitions of restraint and abduction applicable to the facts of this case.

During deliberations, the jury submitted a question[5] to the trial court which requested guidance on when the intent for kidnapping in the first degree must occur and inquired about the liability of another who was present but who had not prevented the sexual abuse from occurring. In order to respond to the question, the trial court reinstructed the jury on the elements of kidnapping in the first degree and, in doing so, the court read, as in its original instructions, the alternative statutory definitions of "abduct" and "restraint" several times. Later in these instructions, however, the trial court specifically reminded the jury that, although

---

concealing her. So, remove that consideration from your minds, and they didn't have her to conceal her, and the fact that she was in the car throughout the course of travel from Norwalk to Buffalo, you will consider all those circumstances for whatever weight you feel they're entitled to. But any concealment, limitation of movement, restriction that occurred throughout that course of time, would not be the basis of a finding of concealment, in respect to a flight inference. That if you define from flight that there's guilty knowledge, no. It would mean that after they got to Buffalo, had they retained custody of her and hid her in some way, that would be concealing a victim."

[5] The jury submitted the following question to the trial court during its deliberations: "Explain kidnapping in the first degree, especially intent to violate and abuse her sexually, when does intent have to take place. Did intent have to occur when the car was taken from Norwalk Tech, or could it occur later?

"If one is guilty of the—of sexual abuse and the other did not prevent the act, is he equally guilty of sexual abuse?"

abduction may be accomplished in "two manners," for the purposes of this case, "you recall we're limiting it to one [of the statutory alternatives]." The trial court, in discussing the element of lack of consent, remarked that if the defendant had accomplished restraint of the victim by moving her from place to place by physical force or intimidation, then proof of actual lack of consent would have become unnecessary. The trial court correctly brought to the jury's attention the only two statutory definitions applicable to this case. The defendant Dahlgren's counsel[6] excepted to the court's reinstruction to the jury in response to the question. At that time, the defendant, however, with reference to this claim, merely "renew[ed] all the other exceptions [he] had previously made where they might be appropriate to this charge." No specific objection was raised at that time to the court's recitation of the full statutory definitions of "abduct" and "restraint."

While we agree with the defendants that the court's initial instruction to the jury may have improperly enlarged the charge by including the uncharged statutory alternatives of restraint and abduction, we must look to the entire instruction and the circumstances surrounding the claimed error. See *State* v. *Jones,* 193 Conn. 70, 90, 475 A.2d 1087 (1984); *State* v. *Vasquez,* 182 Conn. 242, 246, 438 A.2d 424 (1980). The jury was correctly reinstructed prior to any deliberations and the revised instruction explicitly and repeatedly warned the jury not to consider any uncharged alternative definitions.

The trial court's subsequent reinstruction to the jury in response to a question included one of the uncharged alternatives. The exception taken to the charge was not sufficient to alert the trial court to any alleged error

---

[6] Although the defendant Oldread's counsel was not present for the exceptions, counsel for the defendant Dahlgren noted for the record that he shared his objections.

while there was still time to correct it without ordering a retrial. See *State* v. *Jones,* supra, 88. The state claims that the defendants waived any error in the reinstruction. The defendants claim that the issue is nonetheless reviewable in the alternative under the second exceptional circumstance of *State* v. *Evans,* 165 Conn. 61, 69–71, 327 A.2d 576 (1973). Although the final exception by the defendants was inadequate to alert the trial court to any error, we only extend *Evans* review to a claimed enlargement in the charge, where it occurs, if it is accompanied by prejudice or lack of proper notice, in which instance it would involve a defendant's fundamental constitutional rights. *State* v. *Franko,* 199 Conn. 481, 493, 508 A.2d 22 (1986). Unless, therefore, the record adequately supports a claim that there is lack of proper notice or prejudice, then it is not reasonably possible that the jury has been misled.

Our disposition of this issue under the circumstances of this case also requires us to determine whether, in light of the charge as a whole, "it is reasonably possible that the jury were misled. *State* v. *Mason,* 186 Conn. 574, 585–86, 442 A.2d 1335 (1982)." *State* v. *Jones,* supra, 90.

The defendants conceded at oral argument that there was sufficient evidence presented at trial to justify a verdict on either of the alternative definitions of abduct and that the restraint portion of the charge had been corrected by the trial court. While this does not justify an instruction on an uncharged statutory alternative, it is an indication that the defendants were not unduly hampered in their defense of the charges against them or that the jury was instructed to consider a crime for which no evidence was even presented. Cf. *State* v. *Rose,* 169 Conn. 683, 687, 363 A.2d 1077 (1975). An examination of the record discloses that the defendants do not challenge the evidence that was adduced that

touched on the uncharged statutory alternative and, particularly, endeavored to benefit from it to show that D was never held against her will. The prejudice, if any, is minimal. Moreover, we have been given no reasonable explanation as to what either or both defendants would have done differently in conducting the trial *but for* the alleged erroneous instruction. We recognize that the issue is "not whether the verdict is supported by the evidence; rather, it is whether the jury were misled by the charge." Id., 689.

The defendants cite *State* v. *Belton,* 190 Conn. 496, 461 A.2d 973 (1983), in support of their claim that these jury instructions constitute reversible error. *State* v. *Belton* is inapposite and does not support this claim. In *Belton,* a burglary case, the trial court repeatedly used the uncharged statutory alternative method of committing the crime. After the *Belton* jury had deliberated for two hours, it requested a restatement of the definitions of burglary in the first and second degrees, and the trial court's instructions "again repeatedly employed" the uncharged statutory alternative language, so the reinstruction was not curative. *State* v. *Belton,* supra, 503. In this case, however, upon reinstruction, the trial court did give a curative instruction, at the suggestion of the defendants and to which the defendants did not except. This instruction, limiting the jury to only one of the statutory alternatives, was adequate to inform the jury which one of the statutory alternatives it was to consider on the kidnapping counts. There was no "distinct intimation to the jury that they were at liberty to find [the defendants guilty under the concealment alternative]." *State* v. *Rose,* supra, 688. We should also note that the logical distinction that existed in the statutory alternatives under General Statutes § 53a-101 (a) in *Belton,* i.e., where a person "*enters or remains* in a building . . ." is not as apparent in this case. (Emphasis added.) This is so

because the "concealment" prong of General Statutes § 53a-91 (2) (a) is not so distinct from the other prong of "using or threatening to use physical force or intimidation," of General Statutes § 53a-91 (2) (b) because, except in a small number of cases, it is difficult to conceptualize how a kidnapper could conceal a victim without "using or threatening to use physical force or intimidation." In addition, as already pointed out, we cannot conclude that the defendants were prejudiced, especially given the curative instruction limiting the jury's consideration of the kidnapping count. *State* v. *Franko,* supra. "We reiterate our disapproval of a trial court's reading of an entire statute when the defendant has been formally charged under only one section of that statute. *State* v. *Carter,* 189 Conn. 631, 645, 458 A.2d 379 (1983). Nevertheless, we conclude that the error of which the defendant complains is tantamount to a variance between the pleadings and the proof. In the absence of an [adequate] exception, when sufficient evidence on the uncharged [statutory alternative] has been presented to justify its submission to the jury, such a variance does not rise to the level of a constitutional violation unless the record establishes a lack of proper notice or prejudice to the defendant. Since the defendant suffered neither lack of notice nor prejudice in preparing his defense, he cannot prevail on this claim of error." *State* v. *Franko,* supra.

II

The defendants' second claim of error is that the trial court's ruling that certain questions of law could not be asked of prospective jurors on voir dire violated their statutory; General Statutes § 54-82f;[7] and state and fed-

[7] General Statutes § 54-82f states: "In any criminal action tried before a jury, either party shall have the right to examine, personally or by his counsel, each juror outside the presence of other prospective jurors as to his qualifications to sit as a juror in the action, or as to his interest, if any, in the subject matter of the action, or as to his relations with the parties

eral constitutional rights. Prior to the commencement of the voir dire of individual jurors, the trial court informed counsel for both parties that it would follow *State* v. *Anthony,* 172 Conn. 172, 176, 374 A.2d 156 (1976), and that it would not permit any "question on law." Counsel for the defendant Dahlgren was permitted by the court to "make a record" of his prospective voir dire questions in order to determine if the court's ruling precluded them. Counsel for Dahlgren stated that he had intended to ask each juror three questions[8] on "certain recognized principles of law" and whether

---

thereto. If the judge before whom the examination is held is of the opinion from the examination that any juror would be unable to render a fair and impartial verdict, the juror shall be excused by the judge from any further service upon the panel, or in the action, as the judge determines. The right of such examination shall not be abridged by requiring questions to be put to any juror in writing and submitted in advance of the commencement of said action."

[8] Defense counsel for the defendant Dahlgren set forth for the record the three questions that he intended to ask prospective jurors:

"Mr. Meehan: I intend to ask each Juror whether, as to certain recognized principles of law, they understand the meaning of those terms and their application to my client in this case.

"The first being the presumption of innocence, and I intend to ask each prospective Juror whether they recognize that my client seated here today is—with this presumption of innocence, and that is, he is not guilty at this point in time, and unless and until the State produces sufficient evidence to prove all the elements of the crime that he would continue in their eyes to appear not guilty and I would like to ask the question addressed to each prospective Juror on that ground.

"In addition, on the question of proof beyond a reasonable doubt, I would like to address the—each prospective Juror whether or not they understand what the meaning of the term 'Proof beyond a reasonable doubt' is that— and the allocation of the burden of proof between the Defendant and the State. Now, principally, also, whether they understand that although the Defendant has indicated he may call witnesses and may, in fact, during the course of the trial put witnesses on the stand, that the State still retains the burden of proof beyond a reasonable doubt.

"I would like to ask each individual Juror also whether they understand that in a criminal case of this matter the State must prove each and every element of the crime and if they prove most but not all the elements of the crime beyond a reasonable doubt then does the Juror understand that the verdict should properly be, in that regard, not guilty."

the juror "understand[s] the meaning of those terms and their application to my client in this case." The prospective questions on principles of law involved the presumption of innocence, proof beyond a reasonable doubt and the state's burden of proof in a criminal case. Counsel for the defendant Dahlgren stated that the questions would enable him to elicit from prospective jurors whether they could "abide" by the legal principles and if they responded that they could not, it "would go straight to the core of whether or not that individual's qualified to act as a juror in a criminal case." The trial court responded that no questions would be allowed "on the presumption of innocence, the burden of proof . . . any other subject bearing on the law, and that's it." Dahlgren's counsel then asked the court, in light of its ruling, whether it would permit a "continuing exception" and the request was denied.[9] On several occa-

---

[9] The state claims that the defendant Dahlgren's challenge to the voir dire "must stand or fall upon the record of the voir dire as it actually developed" and cannot be evaluated merely on the exception lodged to the court's ruling on the prospective questions. The state also claims that the defendant Oldread has "waived the claim altogether" because only Dahlgren objected and excepted to the court's initial disapproval of the questions of law and because Oldread did not attempt to join in his codefendant's objection. Oldread's counsel inquired of the trial court as to whether a question on the defendant's right to remain silent fell into the "area of limitation."

It is argued that the objection and exception to the trial court's "peremptory ruling" is sufficient to preserve the matter on appeal; in addition, the defendant asked for a continuing objection. Several times when Dahlgren's counsel attempted to ask any of the three questions at issue to a prospective juror, the trial court immediately interjected that the question would not be allowed and that an exception was granted. We do not agree with the state under the circumstances of this case that this claim may only be reviewed upon the record of the voir dire as it "actually developed" because the defendant has adequately set forth the nature of his objection and exception both before and during the voir dire. We will review the claim as to the defendant Oldread as the record is unclear as to whether his counsel's question on the defendant's right to remain silent was separate and distinct from Dahlgren's counsel's questions or a mere addition to the overall inquiry. In any case, "the failure by [the defendant Oldread] fully to chal-

sions, Dahlgren's counsel's attempts to question a prospective juror on a legal principle were immediately rebuffed by the trial court.[10]

"The purpose of the voir dire examination is twofold. 'First, it provides information upon which the presiding judge may decide which of the prospective jurors, if any, he should excuse for cause. Secondly, it informs counsel as to matters which may influence them in the exercise of their right to peremptory challenges.' *Duffy* v. *Carroll,* [137 Conn. 51, 56, 75 A.2d 33 (1950)]." *State* v. *Anthony,* supra, 174-75; see *State* v. *Haskins,* 188 Conn. 432, 446, 450 A.2d 828 (1982). " 'The right to a voir dire examination of each prospective juror in a criminal action is provided by § 54-82f of the General Statutes. [The court has the duty to analyze individual questioning under this section and limit examination to questions relating to (1) juror's qualifications, (2) interest, if any, in the subject matter of the action, and (3) relations with the parties thereto.] This right was established as a constitutional one in 1972 by inclusion in article IV of the amendments to the state constitution of the provision that "[t]he right to question each juror individually by counsel shall be inviolate." *State* v. *Haskins,* [supra, 446]; *State* v. *Anthony,* [supra, 174].' *State* v. *Hill,* 196 Conn. 667, 671, 495 A.2d 699

lenge the [ruling of the trial court] at trial would not be dispositive, since his codefendant adequately alerted the trial court to the possibility of error in a timely fashion. See *State* v. *Jones,* 193 Conn. 70, 88, 475 A.2d 1087 (1984)." *State* v. *Pelletier,* 196 Conn. 32, 34, 490 A.2d 515 (1985).

[10] A noteworthy exception to this is the voir dire examination of a prospective juror, No. 202, who was originally from Norway. When asked by the defendant Oldread's counsel if the fact that the defendant did not testify would "carry any weight . . . with regard to guilt or innocence" the prospective juror replied, "No. I would be surprised if he didn't take the stand." After further questions by Oldread's counsel and by the state, the defendant Dahlgren's counsel was allowed to reexamine the juror on his knowledge of various legal principles, including the presumption of innocence of the defendant and the state's burden of proof. He was then accepted as a juror by the defendants and by the state.

(1985)." *State* v. *Rogers,* 197 Conn. 314, 317–18, 497 A.2d 387 (1985); *State* v. *Burns,* 173 Conn. 317, 321, 377 A.2d 1082 (1977).

The court has wide discretion in conducting the voir dire; see, e.g., *State* v. *Rogers,* supra, 318; *State* v. *Haskins,* supra, 447; *State* v. *Clark,* 164 Conn. 224, 226, 319 A.2d 398 (1973); and the exercise of that discretion will not constitute reversible error unless it has clearly been abused or harmful prejudice appears to have resulted. *State* v. *Hill,* supra, 672; see *Turner* v. *Murray,* 476 U.S. 28, 106 S. Ct. 1683, 90 L. Ed. 2d 27 (1986); *Rosales-Lopez* v. *United States,* 451 U.S. 182, 101 S. Ct. 1629, 68 L. Ed. 2d 22 (1981).

We have repeatedly stated that a juror's knowledge or ignorance concerning questions of law is not a proper subject of inquiry on voir dire. *State* v. *Anthony,* supra, 176; *State* v. *Clark,* supra; *State* v. *Van Valkenburg,* 160 Conn. 171, 173, 276 A.2d 888 (1970); *Duffy* v. *Carroll,* supra, 56; see also *Wright* v. *State,* 374 A.2d 824, 829 (Del. 1977); *Twining* v. *State,* 234 Md. 97, 100, 198 A.2d 291 (1964); *Commonwealth* v. *Hamm,* 325 Pa. Super. 401, 418, 473 A.2d 128 (1984); cf. *People* v. *Zehr,* 103 Ill. 2d 472, 477, 469 N.E.2d 1062 (1984).

The state, in its examination of thirteen of the twenty-five prospective jurors, including six of those accepted to serve, asked if the juror, regardless of his own "notion" of what the law is, would follow the court's instructions on what law must be followed.[11]

---

[11] The assistant state's attorney asked several prospective jurors the following questions: "Q. Okay. Now, many people have ideas of what the law is?
"A. Ah hum.
"Q. And, or sometimes even what the law should be. They don't like what the law is and they think it should be something else. If His Honor instructed you, which he will do, on what the law really is and it differed with your notions of what you thought the law was, or what you thought the law should be, and it was different, would you be able to put your own assumptions that you came into here with aside and follow his Honor's instructions?"

Each of the thirteen jurors so questioned responded affirmatively. In addition, Oldread's counsel asked thirteen prospective jurors a similarly phrased question which incorporated both the nature of the burden of proof in a criminal case, the presumed innocence of the defendant, and the defendant's right not to incriminate himself.[12]

The defendants cite *State* v. *Higgs,* 143 Conn. 138, 120 A.2d 152 (1956), *State* v. *Hill,* supra, and *State* v. *Rogers,* supra, to support their contention that the trial court's ruling was reversible error. In *Higgs,* we held that a trial court's rulings in a voir dire examination excluding all questions concerning race prejudice were an abuse of the court's discretion. *State* v. *Higgs,* supra, 144. In *Hill* and *Rogers,* we held that the trial court's refusal to allow defense counsel to question prospective jurors as to whether they would give more weight to the testimony of a police officer merely because of the officer's status was an abuse of discretion. *State* v. *Rogers,* supra, 319; *State* v. *Hill,* supra, 672–73. Those cases are distinguishable from the present case. In *Higgs, Hill,* and *Rogers,* the defense counsels' questions focused specifically on a prospective juror's ability to judge the credibility of potential witnesses, such as a black defendant or a police officer. One of a juror's most important functions is to analyze and judge the credibility of the witnesses at trial.

The questions the defendants sought to pose in this case would not have aided them in selecting an impar-

---

[12] The counsel for the defendant Oldread asked several of the jurors the following representative question: "In a criminal proceeding, as you're probably aware, the Defendant does not—is not required to testify to prove his own innocence. It's the burden of the State to—or the obligation of the State to prove his guilt. Not the obligation of the Defendant to prove his innocence, and therefore, as part of that right of protection he does not have to take the stand or testify on his own behalf. The Defendant, in a proceeding should [he] elect not to testify, would that have any effect on your rendering a fair and impartial verdict?"

tial jury. The jury is assumed to follow the law as instructed by the trial court. In this case, over one half of the prospective jurors were specifically asked whether they would follow the law as given to them by the court, and each juror responded affirmatively that he or she would do so. The trial court did not abuse its wide discretion in making its rulings and no harmful prejudice resulted to the defendants. See *State* v. *Marra,* 195 Conn. 421, 432, 489 A.2d 350 (1985); *State* v. *Anthony,* supra, 175. The defendants were each acquitted by the jury of three conspiracy counts and this is "perhaps some indication that impartial debate was undertaken, the jury deciding the case on the evidence as it was shown to do." *United States* v. *Barnes,* 604 F.2d 121, 143 n.12 (2d Cir. 1979), cert. denied, 446 U.S. 907, 100 S. Ct. 1833, 64 L. Ed. 2d 260 (1980). We find no error on this claim.

### III

The defendant Dahlgren alone raises a third and final issue. He claims that the trial court's instruction to the jury on the element of intent in kidnapping in the first degree violated his state and federal constitutional rights to due process because it effectively directed a guilty verdict. The element in question, which distinguishes first and second degree kidnapping, is the intent to "violate or abuse [the victim] sexually." General Statutes § 53a-92 (a) (2) (A). The defendant claims that the trial court's instruction and its response to a jury question which included the phrase, "if you find that . . . the Defendants actually did inflict such sexual violation or abuse . . . *there can be little question that it was intended,*" (emphasis added) were erroneous.

The defendant states that the information restricted the allegations of kidnapping, including the intent to violate or abuse sexually, to the actions of the defend-

ants in the parking lot at Norwalk State Technical College and did not include any sexual activity that may have occurred in New York. The intent, he claims, must be complete and proven from the incident that occurred in the parking lot.

The state claims that the defendant Dahlgren only objected to the court's general instruction on specific intent, applicable to all of the offenses, in which the court stated that a person is presumed to intend the natural consequences of his acts. The trial court, in response to the defendant's objection and in order "to get away from *Sandstrom* [v. *Montana,* 442 U.S. 510, 99 S. Ct. 2450, 61 L. Ed. 2d 39 (1979)]," proposed to counsel that it would instruct the jury that one cannot presume intent from the natural consequences of one's act. Counsel for the defendant stated that he was "satisfied with that language." The court thereafter reinstructed the jury and included a thorough statement of the definition of intent, including the statement that "criminal intent, always keep in mind cannot be presumed. The criminal intent . . . cannot be presumed from the natural consequences of an act." There was no exception by the defendant to the court's reinstructions.

The jury then began deliberations and in the course of the deliberations submitted a question to the court which asked when the intent to violate or abuse her sexually had to have taken place—"when the car was taken from Norwalk Tech, or could it occur later?" The court recharged the jury that this intent "must [have been] in the actor's mind at the outset" and then it repeated the statement that if the jury found that the defendants did inflict such violation or abuse, there could be little question that it was intended. The jury was then excused for the day.

It was on the following day that the defendant excepted to the court's instruction, in response to the

jury's question, that if "sexual abuse occurred, then they should find that it was intended," claiming that it raises a presumption. The state responds that the language cited by the defendant merely distinguishes act from intent and notes that the surrounding language is not only highly favorable to the defense but "entirely undercuts any claim of error." Moreover, the state asserts that the allegedly offensive language used by the court—if the jury found that there was sexual abuse, "there can be little question" that he intended it—is not "couched in the language of presumption, and it creates none."

We agree with the state that the instruction at issue did not create a presumption and that the defendant's claim is without merit. It is well established that the state is required to prove all the essential elements of the crimes charged beyond a reasonable doubt. *In Re Winship,* 397 U.S. 358, 361, 90 S. Ct. 1068, 25 L. Ed. 2d 368 (1970). It is also well established, however, that individual instructions are not to be judged in artificial isolation from the overall charge. *State* v. *Williams,* 199 Conn. 30, 37, 505 A.2d 699 (1986); *State* v. *Reddick,* 197 Conn. 115, 132, 496 A.2d 466 (1985), cert. denied, 474 U.S. 1067, 106 S. Ct. 822, 88 L. Ed. 2d 795 (1986); *State* v. *Dolphin,* 195 Conn. 444, 451, 488 A.2d 812, cert. denied, 474 U.S. 833, 106 S. Ct. 103, 88 L. Ed. 2d 84 (1985). "Although general instructions on the burden of proof and presumption of innocence do not alone dispel the possibility of an unconstitutional interpretation of the challenged language, such instructions may be considered in light of the entire charge to determine whether the jury could have [mis]interpreted the [language]." *State* v. *Williams,* supra, 38. The trial court repeatedly emphasized the state's burden of proof on every element of the crime and stated that the jury could not presume intent from action but could infer

it.[13] The court's instruction that the intent must have been present "at the outset," and thus at the Norwalk parking lot, strongly attenuated the jury's use, if any, of the later acts in New York to find intent. "The instructions, read in their entirety, did not direct or advise the jury how to decide the matter, and fairly presented the case to the jury in such a way that no injustice was done to the defendant." *State* v. *Storlazzi,* 191 Conn. 453, 467, 464 A.2d 829 (1983).

In addition, we also note that in this joint trial, the same jury found Dahlgren's codefendant guilty of the lesser included offense of kidnapping in the second degree; General Statutes § 53a-94; an offense which does not require the intent to abuse or violate sexually. This is a very strong indication that the jury did not apply a presumption against the defendants with respect to this element. We find no error on this claim.

There is no error.

In this opinion the other justices concurred.

---

[13] The trial court gave the following additional instruction:

"Now, in respect to intent, the criminal intent, always keep in mind cannot be presumed. The criminal intent cannot be presumed, and it cannot be presumed from the natural consequences of an act.

"However, criminal intent, which is the burden of the State to prove beyond a reasonable doubt, the State has that affirmative burden to satisfy you by the evidence in this case, of existence of the criminal intent in the minds of the Defendants, always retains that burden.

"However, although you cannot presume criminal intent from the natural consequences of the acts you find that have occurred, you may draw inferences from facts that you find proven, and you can find the intent necessary as it existed in the mind of the actors who committed the acts that you find proven. So you can draw an inference, although you cannot presume intent. You can find intent by inferring from facts you find proven.

"But you cannot presume merely because an act is committed and therefore the natural consequences of that act is presumed to have been intended by the actor."