**Mario DiBLASIO, Petitioner–Appellee,**

v.

**John P. KEANE, Superintendent, Sing Sing Correctional Facility, Respondent–Appellant.**

**No. 612, Docket 90–2286.**

United States Court of Appeals, Second Circuit.

Argued Dec. 17, 1990.

Decided May 9, 1991.

---

Nancy F. Talcott, Asst. Dist. Atty., Brooklyn, N.Y. (Charles J. Hynes, Dist. Atty. Kings County and Jay M. Cohen, Asst. Dist. Atty., of counsel) for respondent-appellant.

Barry D. Leiwant, New York City (Phillip L. Weinstein, Legal Aid Soc., of counsel) for petitioner-appellee.

Before MESKILL, PRATT and WALKER, Circuit Judges.

WALKER, Circuit Judge:

The Kings County District Attorney appeals from a judgment of the United States District Court for the Eastern District of New York (Jack B. Weinstein, *Judge*) granting Mario DiBlasio's petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the grounds that the prosecution's failure to identify or produce, in response to DiBlasio's requests, a confidential informant who had arranged for drug sales between DiBlasio and undercover police officers violated DiBlasio's due process rights. The District Attorney argues that DiBlasio failed to demonstrate circumstances that would warrant discarding the informant's traditional veil of confidentiality, noting that the informant's testimony as a witness to the crime was unnecessary as his participation in the sales was minimal and the transactions were tape recorded, and DiBlasio's entrapment defense, which he claimed the informant could corroborate, was highly speculative. We reject these contentions, and agree with Judge Weinstein that, although the informant's testimony was not necessary as a witness to the crime itself, it became necessary when DiBlasio testified to facts which, if believed, would constitute a defense of entrapment and entrapment was in fact charged to the jury.

## BACKGROUND

In May of 1985 an informant known as "Scotty" contacted the New York City Police and offered to arrange a cocaine sale from Mario DiBlasio to undercover police officers. No deal was arranged until July 5 of that year, however, when, in Scotty's house, Scotty introduced DiBlasio to Officer Giardina, who was posing as a drug buyer. Telling Giardina that he could provide him with a steady supply of drugs with "no problem," DiBlasio sold four ounces of cocaine to Giardina for $6,500. Scotty was not in the room during most of the conversation between DiBlasio and Giardina.

On July 10 a second sale occurred when DiBlasio, a medical doctor, handed eight ounces of cocaine to Officer Giardina for $13,600, with Scotty present, in DiBlasio's hospital office. This conversation, like most of DiBlasio's subsequent communications with undercover police officers, was tape recorded.

On July 17 Giardina called DiBlasio to complain about the quality of the drugs he had purchased. Officer Owens then spoke to DiBlasio, and, posing as Giardina's "boss", complained about the quality and threatened to go to another supplier. When DiBlasio protested, Owens said he would give DiBlasio another chance if he could test an ounce of DiBlasio's cocaine for purity. DiBlasio agreed, suggesting that they test it together.

At this point, Scotty dropped out of the case, and did not appear at any subsequent meetings between DiBlasio and the undercover police.

On July 18 Giardina called DiBlasio to arrange a meeting to test the cocaine. Owens and another undercover officer, known as "Joey," came over to DiBlasio's house. Owens offered to have a friend test the cocaine, but DiBlasio insisted that he could test it right there—which DiBlasio did by "cooking" the cocaine, as if he were going to "freebase" it. Owens then asked DiBlasio for an ounce in order to run an independent test, but DiBlasio said he only had what was left of the tested cocaine, about 11 grains. When Owens and "Joey" then asked DiBlasio for more cocaine, in the range of a pound or a kilogram, DiBlasio stated that he thought he could provide it.

On July 20, DiBlasio called Owens to say that he would soon be able to provide him with another ounce. Later he called to say it was available. Owens went to DiBlasio's home to pick it up; however, when he arrived, DiBlasio did not have the ounce. He explained that he did not have enough money to pay his supplier for the cocaine.

On July 23 "Joey" called DiBlasio to ask him to supply them with a pound of cocaine. When DiBlasio asked them why they did not want the ounce to test first, "Joey" told him that they would test the new batch together. "Joey" also asked DiBlasio to look around for a heroin supplier, to which DiBlasio agreed.

On July 26 "Joey" and Owens went to DiBlasio's home. They found it filled with boxes and DiBlasio explained to the officers that he was moving away from New York. DiBlasio then "tested" one ounce of cocaine for them by again "cooking" it. Officer Owens then agreed to pay DiBlasio $1,800 for the ounce, but gave DiBlasio only $900. DiBlasio did not notice the mistake, however, because he immediately handed over the cash to his supplier. As the supplier left, both he and DiBlasio were arrested.

## PROCEEDINGS

In 1986 DiBlasio went to trial before a jury in the New York State Supreme Court on charges of criminal sale of a controlled substance in the first, second and third degrees, and criminal possession of a controlled substance in the fourth degree. Before the jury was sworn, defense counsel moved that the District Attorney produce "Scotty", or disclose his name or location so that the defense might interview him with a view toward his testifying for defendant. The court denied DiBlasio's motion to produce Scotty, stating that while "the witness' testimony might be helpful on [a] defense of entrapment," Scotty's testimony was not necessary to identify DiBlasio as the person who sold the drugs, or to testify to the fact that the transactions took place as the police and tapes said that they did.

Shortly after the start of the prosecution's case, defense counsel moved again for the informant's production. The motion was denied. Later in the trial, defense counsel moved again for disclosure, asserting that the informant's testimony was necessary to support what would be DiBlasio's defense of entrapment. Again, the court denied the defendant's motion.

DiBlasio took the stand in his own defense. He testified that he had been a cocaine addict since 1984, although he had never sold the drug before the recorded transactions, and had no previous arrests or convictions for drug sales. He said that he met Scotty in 1984 and they began using cocaine together. Scotty eventually became his only friend, because his family, friends and colleagues in the medical profession turned away from him due to his drug addiction.

DiBlasio testified that Scotty said he made his living by selling cocaine. He testified that Scotty had asked him to provide cocaine to people to whom Scotty had "fallen short" beginning in March of 1985, but that he had refused continuously from March through July 1985. Then, DiBlasio stated, a few days before July 5 Scotty told him that the drug dealers with whom Scotty was connected had threatened his life unless he provided them with drugs. At that point, DiBlasio agreed to do what Scotty asked him to do—that is play the part of a "drug dealer" to Scotty's customers. These conversations between DiBlasio and Scotty were not tape recorded.

DiBlasio testified that he then purchased six ounces of cocaine from his regular personal supplier, which he and Scotty diluted with lactose to make twelve ounces of a mixture to sell to Scotty's customers. DiBlasio testified that Scotty called him on July 5, told him that the dealers were at his house, and that he should bring over four ounces of the mixture. The deal then went forward as the officers testified.

After this, DiBlasio testified, Scotty told him that the dealers wanted more cocaine, and that Scotty's life would be in danger if they failed to go through with the transaction. The transaction at DiBlasio's hospital office followed.

A few days later, according to DiBlasio, Scotty told him that they would both have to disappear because they would not be able to supply the large quantities of high quality cocaine that the drug dealers wanted. And indeed, DiBlasio testified, Scotty did disappear at this point. DiBlasio however continued the transactions out of fear, until he could figure out a way to disappear himself. In fact, he was moving out of his home when the police came there for the last deal, which accounted for the boxes that the police noticed on entering his home.

After DiBlasio's testimony, at the end of the defense case, defense counsel moved again for Scotty's production, or the disclosure of his whereabouts. The trial court again denied the motion.

The judge instructed the jury on the entrapment defense without objection from the prosecution. On the second day of deliberations, the jury asked to be reinstructed on the law of entrapment. After the instruction, to which defense counsel objected, the jury quickly returned a guilty verdict against DiBlasio. DiBlasio was later sentenced to concurrent sentences totalling 21 years to life imprisonment.

DiBlasio appealed his conviction to the Appellate Division of the State of New York, Second Division, contending that his sixth and fourteenth amendment rights were violated by the trial court's refusal to grant him access to the informant, whose testimony "could have been of crucial significance to [his] entrapment defense." The Appellate Division affirmed his conviction, holding that the trial court did not abuse its discretion by refusing to produce the informant, because his "participation in the transactions was minimal." The New York Court of Appeals denied leave to appeal.

DiBlasio then filed a habeas corpus petition in the Eastern District of New York, claiming that the court's failure to order production or identification of Scotty violated his due process rights because the informant's testimony was essential to his entrapment defense, on which the jury had been instructed. Ruling from the bench, Judge Weinstein granted DiBlasio's petition. This appeal followed.

## DISCUSSION

*Roviaro v. United States,* 353 U.S. 53, 77 S.Ct. 623, 1 L.Ed.2d 639 (1957), describes the circumstances under which the government's privilege to withhold the identity of those who furnish information about violations of law to law enforcement officials must yield to a defendant's fundamental right to a fair trial. "Where the disclosure of an informant's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60–61, 77 S.Ct. at 627–628 (footnote omitted). This circuit has interpreted *Roviaro* to re-

quire disclosure when it is "material to the defense." *United States v. Saa*, 859 F.2d 1067, 1073 (2d Cir.1988), *cert. denied*, 489 U.S. 1089, 109 S.Ct. 1555, 103 L.Ed.2d 858 (1989). The determination of materiality lies with the trial judge, subject to an "abuse of discretion" standard of review. *United States v. Van Ordsdell*, 521 F.2d 1323, 1326 (2d Cir.1975), *cert. denied*, 423 U.S. 1059, 96 S.Ct. 796, 46 L.Ed.2d 650 (1976). The judge must consider a number of factors in determining whether the informant's testimony is material: "the crime charged, the possible defenses, the possible significance of the informant's testimony and other relevant factors." *Saa* at 1073 (quoting *Roviaro*, 353 U.S. at 61–62, 77 S.Ct. at 628–629). The District Attorney, drawing on a wealth of caselaw dealing with informants as witnesses or participants in the crime charged against defendant, argues that Scotty was only present during the transaction between DiBlasio and the police at DiBlasio's hospital office, and was not a "key" witness to that event, since the transaction was tape recorded, and was testified to by both the undercover officers and DiBlasio. Therefore Scotty's testimony could not be considered "material" to the defense, because it was not required to corroborate a contested account of what actually happened during the commission of the crime. This argument follows the reasoning of both the trial court and the Appellate Division, who supported the denial of DiBlasio's motion to produce the informant on the grounds that Scotty's participation in the transaction which constituted the offense was "minimal." We reject this argument.

While we agree that the informant's testimony was not material to the state's case, the same cannot be said regarding the entrapment defense. The state courts mistakenly focused on only one scenario in which an informant's testimony may be "material"—that in which the informant is actually present during the commission of the crime charged. However, when the defendant raises the defense of entrapment, or claims that he did not have the requisite state of mind for the offense charged, testimony about events preceding and in between these crimes may be as material as that detailing their actual commission, or more so. The Supreme Court realized as much in *Roviaro*, when it required the informant's identity to be disclosed because, among other reasons, "Doe had helped *to set up* the criminal occurrence and had played a prominent part in it. His testimony might have disclosed an entrapment." 353 U.S. at 64, 77 S.Ct. at 629 (emphasis added). Similarly in *United States v. White*, 324 F.2d 814 (2d Cir.1963), we held that the defendant should have an opportunity to present an informant's testimony in order to develop an entrapment defense. There the informant "Lynn" talked to the defendant before the latter purchased heroin from one undercover agent, and then sold it to another. The defendant testified that Lynn told him during the conversation that Lynn and the purchasing agent needed his help in obtaining heroin for them because they were "sick." After persuasion, the defendant testified, he purchased the drug from the undercover source to which Lynn directed him, and then turned the heroin over to the purchasing agent, who reimbursed him for it.

[A]ppellant might have developed something from Lynn which could have tipped the scales in his favor. A significant aspect of appellant's defense was his claimed ignorance of a potential supplier and his reluctance in agreeing to engage in the transaction. The truth of these assertions depended on what transpired when appellant and Lynn first met and conversed outside [the agent's] hearing. There was no other way for appellant to substantiate his defense. Thus, the testimony sought to be adduced would not have been merely cumulative and would [have] done more than impeach the Government witnesses.

. . . .

Here appellant had actual possession of the narcotics, he made delivery, and he received the money. All necessary elements of the crime under the statute had been established. Entrapment, if he could prove it, was his only hope.

Lynn's participation in the transaction has been so described by the narcotics agents as to make him a material witness on this phase of the case.

324 F.2d at 816.

*White* is dispositive of this case. There, as here, defendant took the stand and testified that the informant induced him to commit a crime in order to help the informant. In DiBlasio's case, if the defense were believed, the apparent salesmanship of an eager drug dealer could be viewed as the playacting of a drug abuser who, having access to a small supply of cocaine, assumed the role of a dealer in order to aid a friend. However, as in *White*, the only witness who could corroborate this defense was the confidential informant. Scotty's testimony as to what he did or did not say to DiBlasio both before DiBlasio sold cocaine to the undercover officers, and between the first and second sales, was "relevant and material" to the case, and, if it corroborated DiBlasio, "helpful to the defense." Therefore, under the standards enunciated in *Roviaro* and *Saa*, disclosure of the informant was clearly required.

The District Attorney argues, however, that DiBlasio's tale of entrapment at trial was so implausible that it amounted to mere speculation. The District Attorney contends that such a presentation does not justify violating the informant's confidentiality, and cites *United States v. Gonzales*, 606 F.2d 70, 75 (5th Cir.1979), to support his argument that "mere conjecture or supposition about the possible relevancy of the informant's testimony is insufficient to warrant disclosure." 606 F.2d at 75. That case, however, is inapposite, since it concerns a defendant who failed to make any evidentiary presentation whatsoever of his entrapment defense, but merely alleged that entrapment had occurred. Here DiBlasio did more than posit the possibility of entrapment; he introduced evidence which, if believed, would establish this defense. What is more, the trial court went on to give an entrapment charge to the jury. "[E]ntrapment", as Judge Weinstein noted, was "in the case." The only remaining issue is whether the defense, once presented, is credible. This is a question reserved for the jury as fact-finder. *See People v. McGee*, 49 N.Y.2d 48, 60–61, 424 N.Y.S.2d 157, 164, 399 N.E.2d 1177, 1183 (Ct.App. 1979), *cert. denied*, 446 U.S. 942, 100 S.Ct. 2166, 2167, 64 L.Ed.2d 797 (1980).

Upon any retrial of this case, assuming that the entrapment defense is adhered to, due process requires that the name of the informant be given to the defense, and his last known whereabouts disclosed. Alternatively, if the government chooses and is able, it may physically produce the informant for testimony; in which case, depending on circumstances at trial, the trial judge may conclude that disclosure of his true identity or where he resides is not necessary.

Affirmed.