## STATE OF CONNECTICUT *v.* ANNA LEE
### (10905)

DALY, LAVERY and SCHALLER, Js.

Argued December 3, 1992—decision released March 2, 1993

*Jeremiah Donovan,* special public defender, with whom, on the brief, was *Terry Sablone Donovan,* special public defender, for the appellant (defendant).

*John A. East III,* deputy assistant state's attorney, with whom, on the brief, were *C. Robert Satti, Sr.,* state's attorney, and *John P. Pannone,* assistant state's attorney, for the appellee (state).

SCHALLER, J. The defendant appeals from the judgment of conviction, rendered after a jury trial, of criminal attempt to possess more than one kilogram of marihuana with intent to sell by a person who is not drug-dependent in violation of General Statutes §§ 21a-278 (b) and 53a-49 (a) (2). The defendant claims that the trial court (1) improperly denied her motion to dismiss, (2) improperly (a) declined to order the state to disclose information concerning its informants, (b) precluded cross-examination concerning their activity and (c) declined to order the state to produce an informant for trial, (3) improperly declined to recognize the defense of "objective entrapment," (4) improperly foreclosed the defendant from inquiring into the potential

bias of a witness, (5) improperly permitted testimony concerning firearms seized at the defendant's residence, (6) improperly refused to admit evidence pertaining to charges against the defendant that the state had dismissed, and (7) improperly restricted the defendant's inquiries into the attitudes of prospective jurors toward the defense of entrapment. We reverse the trial court's judgment and remand the case for a new trial.

The following facts are pertinent to the resolution of this appeal.[1] At the time of trial, Anna Lee, the defendant, was fifty-five years old and had no criminal record. Her son, Mario, had been arrested in Fort Lauderdale, Florida, for conspiracy to possess cocaine. Although the Florida Appellate Court recently reversed his conviction; *Krajewski* v. *State,* 587 So. 2d 1175 (Fla. Dist. Ct. App. 1991);[2] he was imprisoned in Florida prior to and during the incidents giving rise to the defendant's conviction. During Mario's imprisonment, the defendant received crudely written letters from other inmates, some threatening Mario's life. In addition, she sent money orders and other items to inmates for her son's protection. Her correspondence with her son and other inmates revealed her deep concern for Mario's well-being.

When calls and letters from Mario ceased, the defendant decided to travel to Florida. En route, the defendant learned that her son was in solitary confinement because of threats on his life by other inmates. Even-

---

[1] The following facts are based predominantly on testimony adduced at trial. Some of the facts, however, are drawn from tape recorded conversations which were not made part of the record for appeal. To the extent that the parties are in agreement, we accept their references to the content of these tapes.

[2] In *Krajewski*, the court held that the defendant's due process rights had been violated because the state gave an informant carte blanche to set up drug deals and suggested that he would not get a reduced sentence unless he rendered substantial assistance.

tually, she met with her son who appeared to her to have "heat rashes on him."

Because of her concerns about the conditions of Mario's imprisonment, the defendant was determined to obtain the assistance of a private attorney to pursue Mario's appeal. She had already spent thousands of dollars on Mario's trial and was hesitant to draw further on her line of credit with Household Finance Company, especially since she and her husband had no promising job prospects. The defendant, at this point, had begun to deteriorate mentally and physically and would "break down constantly."

Against this background, the defendant became involved with persons purportedly interested in selling her large quantities of marihuana for resale. She first spoke with Augustus Buckley.[3] Buckley, an informant and Florida prison inmate, telephoned the defendant to discuss the possibility of the purchase and sale of fifty pounds of marihuana for $40,000 to be delivered to the defendant without an advance payment. Buckley further explained that he was a friend of Mario and that the defendant should try to get a private attorney to handle Mario's pending appeal. Buckley's wife also spoke with the defendant.

Buckley then informed Detective Daniel Losey of the Fort Lauderdale police department that the defendant was interested in purchasing marihuana for resale. Losey subsequently decided to contact the defendant. In his first telephone call to the defendant, on July 23, 1990, Losey explained that he was aware of her interest in purchasing marihuana. Before discussing the possibility of a sale, Losey suggested that they refer to

---

[3] Augustus Buckley's involvement with the transaction at issue was primarily set forth by the defendant when she testified. The trial court, however, permitted her to refer to Buckley only as a "voice" with whom she spoke. We use his name here to avoid confusion.

the marihuana as "carpet" and its quantity, in pounds, as "feet." Contrary to the discussion between Buckley and the defendant, Losey explained that he typically would not sell less than 150 feet of carpet in a given deal and quoted a price of $1000 per foot. Further, Losey said that he would require the defendant to send him an advance payment of $3000. The defendant expressed reluctance to entertain the deal as proposed. She stated, "for the first time it's too big an amount." Losey then reduced the quantity proposed from 150 to 50 feet, but insisted on the advance payment and the originally quoted price. The defendant still declined to go ahead with the deal because of the advance payment requirement.

Losey telephoned the defendant the next day. The defendant again expressed her reluctance, citing the $3000 advance and the price of $1000 per foot. She did, however, state: "I wish, make this deal come true, make some money." The conversation concluded without any fixed arrangement.

Eight days later, on August 2, 1990, Losey again telephoned the defendant. In this conversation, Losey told the defendant that he would be willing to reduce the price from $1000 to $800 per pound. The defendant also testified that around this time Buckley had contacted her and urged her to accept the requirement that there be an advance payment, because the advance was going to be paid to his wife. According to the defendant, Buckley said, "I think your son's sentence will end very soon. We end his sentence very soon if you go through with it."

On August 8, 1990, Losey telephoned the defendant. In this conversation, the defendant insisted that the deal would have to be "cash on delivery." Losey responded that he would be able to meet her demands

in this respect since he was making a delivery in the area anyway. He further stated that he would call the defendant later.

A week later, Losey made yet another call to the defendant. The defendant explained to Losey that too much time had elapsed and that she did not want to buy marihuana from him. Through her correspondence with her son and Buckley, the defendant became skeptical about the relationship between Buckley and Losey, concerned that they might be attempting to "set her up." As she understood it, the "set up" would then result in a reduced sentence for Buckley. Losey dispelled her anxieties explaining that Buckley was probably "going crazy" in prison and that Buckley believed everyone was taking advantage of him. When Losey swore that he was not a police officer, the defendant then told him to deliver the marihuana to her.

Losey called the defendant the next day and asked if they could meet in Connecticut the following morning. Losey restated the deal as involving the sale of fifty pounds of marihuana for $40,000. The next day, August 17, Losey contacted the defendant and told her that he was staying at a motel in East Lyme. The defendant went to Losey's room. From that point on, a surveillance team closely monitored the activities of the defendant and Losey.

Losey and the defendant met in the motel room. From there, the two proceeded to a Household Finance Company office where the defendant drew a check from her line of credit. She showed the check to Losey, who was assured that it could be cashed at any bank. She was immediately arrested. That same day, the police obtained a warrant and searched the apartment of the defendant and her husband. The police found marihuana seeds, three small marihuana plants, scales com-

monly used for purposes that are not related to drugs, three hunting rifles and a handgun.[4]

The defendant was brought to trial for attempted sale of marihuana in violation of General Statutes §§ 21a-278 (b) and 53a-49 (a) (2). She sought to establish a defense based on entrapment within the purview of General Statutes § 53a-15.[5] The jury, however, returned a verdict of guilty and judgment was rendered accordingly. This appeal followed.

## I

Before reaching the dispositive issue, we first address the trial court's denial of the defendant's motion to dismiss. The defendant claims that the trial court improperly declined to apply Florida law in denying her motion to dismiss. In her view, because the investigative activities at issue in this case would warrant a dismissal in Florida, the trial court should have dismissed the case. We are not persuaded.

We note that the defendant does *not* challenge this state's jurisdiction over the case. It is clear, in any event, that Connecticut is the proper forum in which to prosecute the defendant because the attempted drug transaction at issue was consummated in this state. A. Spinella, Connecticut Criminal Procedure (1985) § 3A. A finding that Connecticut has criminal jurisdiction over this case leads inescapably to the application of this state's criminal code. Indeed, both the charge of attempted distribution of drugs and the defense of entrapment are specifically embodied in our General

---

[4] The defendant's husband testified that the guns and marihuana were his.

[5] General Statutes § 53a-15 provides: "In any prosecution for an offense, it shall be a defense that the defendant engaged in the proscribed conduct because he was induced to do so by a public servant, or by a person acting in cooperation with a public servant, for the purpose of institution of criminal prosecution against the defendant, and that the defendant did not contemplate and would not otherwise have engaged in such conduct."

Statutes. See General Statutes §§ 21a-278 (b) and 53a-15. Accordingly, we cannot properly look to the law of another jurisdiction simply because its laws are more favorable to the defendant.

The defendant's claim is rooted in the policy consideration that Connecticut should not "becom[e] dumping grounds for prosecutions that would be dismissed in the courts of sister states." Whether that problem currently exists or is likely to arise in the future is an issue for the legislature to consider with the aid of empirical data. The legislature is, of course, free to amend our penal code accordingly. We decline, however, to pave the way for a criminal justice system in which our courts piece together the myriad criminal codes across the nation. The trial court properly declined to apply Florida law in denying the defendant's motion to dismiss.

## II

The defendant's principal argument is that she was unable to present her defense of entrapment because she did not have access to information concerning Buckley, a government informant. We find merit in this contention.

The following additional facts are pertinent to this aspect of the appeal. Testimony of witnesses for the state and the defendant established that Buckley, a prison inmate who knew the defendant's son, informed Losey of the defendant's interest in buying marihuana for distribution. According to the defendant, Buckley's involvement went far beyond that of a mere informant. In her view, Buckley was intimately involved in the negotiations that led to the undercover drug transaction. The defendant also believed that Buckley and Losey worked together in trying to effectuate the deal.

The procedural history of this case reveals that throughout the course of the litigation the defendant made every effort to learn more about Buckley's involvement with the undercover deal. Before trial, the defendant twice requested information regarding government informants, i.e., names, addresses, and promises made by the government to informants. The defendant made an offer of proof in support of this motion explaining that Buckley had repeatedly telephoned her and had urged her to purchase marihuana. The defendant further asserted that with more information regarding the role of Buckley, her attorney would be able effectively to cross-examine Losey and to establish her defense of entrapment.[6] The court denied the defendant's motion.

In the course of trial, Losey testified that Buckley had informed him of the defendant's interest in buying marihuana. The defendant subsequently renewed her motion for disclosure, again insisting that information concerning Buckley was critical to her case. The court denied the motion. The defendant made several other fruitless attempts to learn more about Buckley and even to compel the state to produce Buckley as a witness. Ultimately, the defendant was unable to contact Buckley or to call him as a witness.

The defendant did, however, offer limited testimony as to telephone calls made by Buckley, albeit without reference to his name. The gravamen of her testimony was that some unidentified "voice" had urged her to effectuate the drug deal.[7] The defendant testified that Buckley was an inmate and that he and her son were good friends. According to the defendant, Buckley

---

[6] At this point, the defendant essentially explained that she could not afford the expenses associated with transporting Buckley to Connecticut for trial.

[7] Over defense counsel's objection, the court would not permit the defendant to refer to the "voice" as Augustus Buckley.

urged her to buy drugs and advised her that the proceeds would enable her to hire a private attorney to represent her son in his pending criminal appeal.

Mindful of this factual background, we consider the applicable legal principles. Whether the government must disclose information concerning an informant depends on a well established balancing test originally set forth in *Roviaro* v. *United States,* 353 U.S. 53, 77 S. Ct. 623, 1 L. Ed. 2d 639 (1957). There, the United States Supreme Court held that disclosure must be analyzed on a case by case basis, "balancing the public interest in protecting the flow of information against the individual's right to prepare his defense." Id., 62. While the Supreme Court's holding in *Roviaro* was not rooted in the federal constitution, its balancing test has repeatedly guided our courts in resolving similar issues. See, e.g., *State* v. *Richardson,* 204 Conn. 654, 657–59, 529 A.2d 1236 (1987); *State* v. *McDaniel,* 176 Conn. 131, 133, 405 A.2d 68 (1978).

Under the *Roviaro* balancing test, case law has delineated the extent to which disclosure *"might* have been helpful to the defense." (Emphasis added.) *Roviaro* v. *United States,* supra, 63–64; *United States* v. *Saa,* 859 F.2d 1067 (2d Cir. 1988), cert. denied, 489 U.S. 1089, 109 S. Ct. 1555, 103 L. Ed. 2d 858 (1989) (requiring disclosure to be material to the defense). Before a court will compel disclosure, the informant typically must be a participant in the alleged crime or an eyewitness thereto. *State* v. *Conger,* 183 Conn. 386, 392–93, 439 A.2d 381 (1981); *State* v. *McDaniel,* supra, 134. By contrast, courts generally agree that if the informant provides information to law enforcement officers without any further involvement, disclosure must yield to the protection of the informant. W. LaFave & J. Israel, Criminal Procedure (1984) § 23.3.

Federal courts have further developed the *Roviaro* balancing test for cases in which the defendant has distinctly invoked the defense of entrapment. In such cases, the events *leading up to* the commission of the crime "may be as material as that detailing their *actual commission,* or more so." (Emphasis added.) *DiBlasio* v. *Keane,* 932 F.2d 1038, 1042 (2d Cir. 1991). Thus, information pertaining to an informant involved in *setting up* the crime may disclose an entrapment. *Roviaro* v. *United States,* supra, 64. Furthermore, "if the informant arranged for the illegal transaction but was not present when it occurred, it would seem that disclosure would be called for *were the defendant to claim entrapment.*" (Emphasis added.) W. LaFave & J. Israel, supra.

In this case, application of the *Roviaro* balancing test clearly favors disclosure. According to the defendant's testimony, Buckley played an integral role in persuading her to purchase marihuana. Although the evidence is sparse, it is undisputed that there is a link between Losey and Buckley. Testimony also indicates that Buckley was an inmate and friend of the defendant's son. It is highly plausible, therefore, that Buckley was an active participant in the drug transaction, working in conjunction with the government. The defendant testified, moreover, that Buckley played on her fears regarding the brutality of her son's prison conditions. This testimony persuades us that information concerning Buckley was material to the defense of entrapment.

In the state's view, because Buckley did not participate in the crime, the defendant was not entitled to disclosure concerning this informant. We disagree. As previously stated, the defendant testified that Buckley pressured her into the transaction throughout her negotiations with Losey. While it is true that Buckley was not the *sole* participant in the undercover transaction, the defendant's testimony indicates that he was

instrumental in seeing that the defendant and Losey consummated the deal. In fact, given Buckley's apparent relationship with the defendant's son, it is likely that Buckley wielded considerable influence over her decision to purchase drugs. There is, thus, a sufficient likelihood that Buckley played a critical role in arranging the undercover drug deal.

The state further posits that Buckley's alleged entrapment of the defendant is the product of sheer speculation. This argument is misplaced, however, because the defendant did offer some evidence to support her theory, i.e., her testimony regarding what the "voice" said to her on the telephone. See *DiBlasio* v. *Keane,* supra, 1043. Moreover, the state's argument is somewhat circular, since without disclosure the defendant cannot fully develop her theory as to Buckley's involvement.

We hold that the nondisclosure of Buckley's whereabouts deprived the defendant of her right to present a defense. On retrial, therefore, the state must reveal this information. Alternatively, the state may produce Buckley as a witness in lieu of disclosing his present location.

Because a new trial is necessary, we will consider those remaining claims that are likely to affect the proceedings on remand.[8]

---

[8] Because a new trial is necessary, we will not address the defendant's claim that the trial court should have permitted the defendant to testify as to the identity of the person who telephoned her. Our conclusion that the state must either disclose Buckley's whereabouts or produce him as a witness alters the nature of this claim considerably and we will not speculate as to how this issue may again arise during the course of proceedings on remand.

Nor do we find merit in the defendant's contention that the court should have granted her motion for acquittal. In support of the motion, the defendant argues the existence of entrapment as a matter of law. Because, in essence, the defendant challenges the sufficiency of the evidence on the issue of entrapment, we consider the evidence in the light most favorable

### III

The defendant next asserts that the trial court improperly declined to recognize a defense based on "objective entrapment." This argument, if accepted, is likely to impact evidentiary rulings and, ultimately, the jury instructions on remand. Hence, it is necessary to resolve this issue as part of the present appeal.

Throughout this century, federal and state courts have debated the appropriate scope of the entrapment defense. The debate hinges largely on whether entrapment should focus on investigatory practices or on the criminal predisposition of a particular defendant. See C. Whitebread & C. Slobogin, Criminal Procedure: An Analysis of Cases and Concepts § 1901, pp. 468–69 (3d Ed. 1993). The United States Supreme Court in *Sorrells* v. *United States*, 287 U.S. 435, 442, 53 S. Ct. 210, 77 L. Ed. 413 (1932), settled the matter in the federal courts, holding that entrapment exists "when the criminal design originates with the officials of the Government, and they implant in the mind of an *innocent person* the disposition to commit the alleged offense and induce its commission in order that they may prosecute." (Emphasis added.) Thus, the court refused to conceptualize entrapment as solely an issue of police practices, focusing also on the defendant's tendency toward engaging in criminal activity. See also *Jacobson* v. *United States*, 503 U.S.     , 112 S. Ct. 1535, 1540, 118 L. Ed. 2d 174 (1992) (where defense of entrapment

---

to sustaining the verdict to determine whether the facts established and the reasonable inferences drawn therefrom support a verdict of guilty beyond a reasonable doubt. *State* v. *Pearl*, 28 Conn. App. 521, 526, 613 A.2d 304 (1992). We conclude that the evidence sufficiently supports the judgment of conviction. It is, of course, possible that on retrial the defense of entrapment will obtain with the benefit of additional evidence pertaining to the involvement of Buckley.

is at issue, "the prosecution must prove beyond reasonable doubt *that the defendant was disposed to commit the criminal act* prior to first being approached by Government agents" [emphasis added]).

In much the same fashion as the United States Supreme Court, the legislature of this state settled the debate with the enactment of General Statutes § 53a-15. Under this provision, the defense of entrapment obtains if "the defendant engaged in the proscribed conduct because [she] was induced to do so by a public servant, or by a person acting in cooperation with a public servant . . . and . . . the defendant did not contemplate and *would not otherwise have engaged in such conduct.*" (Emphasis added.) General Statutes § 53a-15. This provision makes abundantly clear that entrapment exists only if the defendant was *not* predisposed to committing the crime at issue. *State* v. *Avery,* 152 Conn. 582, 583–84, 211 A.2d 165 (1965); *State* v. *Grant,* 8 Conn. App. 158, 164, 511 A.2d 369 (1986).

An understanding of a defendant's predisposition requires a subjective inquiry that considers whether "the criminal intent or the willing disposition to commit the crime originates in the mind of the accused . . . ." (Internal quotation marks omitted.) *State* v. *McNally,* 173 Conn. 197, 201, 377 A.2d 286 (1977); *State* v. *Marino,* 23 Conn. App. 392, 396, 580 A.2d 990, cert. denied, 216 Conn. 818, 580 A.2d 63 (1990). Of course, in assessing the defendant's predisposition, the nature and severity of the government inducement is a necessary reference point. *State* v. *McNally,* supra; *State* v. *Marino,* supra. Logically, the greater the pressure from the government, the greater the likelihood that an innocent person will engage in criminal conduct. Under the statute, however, the inducement *by itself* cannot give rise to the defense. General Statutes § 53a-15.

The defendant argues that Connecticut should adopt an objective standard for entrapment that focuses on the egregiousness of the government inducement, without regard to the defendant's predisposition to commit a particular crime. The defendant insists that the adoption of an objective standard would not usurp the function of the legislature but, rather, is a necessary incident to our court's supervisory authority over criminal justice. We disagree with the defendant's position.

It is not a proper function of this court's to rewrite statutes. *State* v. *Hanson,* 210 Conn. 519, 529, 556 A.2d 1007 (1989); *State* v. *Perrucio,* 192 Conn. 154, 163 n.4, 471 A.2d 632, appeal dismissed, 469 U.S. 801, 105 S. Ct. 55, 83 L. Ed. 2d 6 (1984). While our penal code does not preclude our courts from recognizing defenses in addition to those created by statute; General Statutes § 53a-4; *State* v. *Woods,* 23 Conn. App. 615, 583 A.2d 639 (1990); *State* v. *Messler,* 19 Conn. App. 432, 562 A.2d 1138 (1989); we are not free to fashion a defense that would undermine a provision of the code. General Statutes § 53a-4. An adoption of the objective standard by this court would abrogate the present statute almost entirely. A defense based solely on the nature of the police practices is wholly inconsistent with the statute's requirement that the defense entrapment focus on the defendant's criminal predisposition. In fact, if we were to accept the defendant's view, a person predisposed to commit the crime charged would disregard the statute and present a defense solely on the basis of objective entrapment. This would surely undermine the current statute and is contrary to our case law addressing this matter. See *State* v. *McNally,* supra. In the final analysis, the unambiguous terms of the statute require that the defendant "would not otherwise have engaged in [the proscribed] conduct." General Statutes § 53a-15.

Furthermore, we do not accept the defendant's suggestion that we adopt the defense of objective entrap-

ment pursuant to our supervisory powers over criminal justice. In rejecting this claim, we stress that § 53a-15, while focusing on the defendant's criminal predisposition prior to the inducement, necessarily requires inquiry into the nature of the investigative practices. *State* v. *McNally,* supra. Thus, the defendant's claim that we disregard § 53a-15 and adopt an objective standard for entrapment is without merit.

## IV

The defendant next claims that the trial court improperly precluded inquiry into the potential bias of the state's expert witness. We agree with the defendant.

At trial, the state called Special Agent David Hoyt of the Drug Enforcement Administration (DEA). As an expert witness, Hoyt testified to the usual tactics of the DEA in monitoring drug trafficking and in using informants. Hoyt also explained the price, quantity and quality of various grades of marihuana. Defense counsel then cross-examined Hoyt and sought to establish the witness' bias. The asserted bias was due to the fact that Hoyt's employer, the United States government, stood to gain from a guilty verdict insofar as such a verdict would enhance the likelihood of a successful forfeiture action against the defendant. The trial court sustained the state's objection to this line of inquiry and noted defense counsel's exception to the ruling.

A defendant's right to cross-examine witnesses presented against her is basic to our system of criminal justice. "[A]n important function of cross-examination is the exposure of a witness' *motivation* in testifying." (Emphasis added.) *State* v. *Arline,* 223 Conn. 52, 60, 612 A.2d 755 (1992); *Douglas* v. *Alabama,* 380 U.S. 415, 418, 85 S. Ct. 1074, 13 L. Ed. 2d 934 (1965); *Green* v. *McElroy,* 360 U.S. 474, 496, 79 S. Ct. 1400, 3 L. Ed. 2d 1377 (1959). In fact, "[t]he exposure of a witness' motivation in testifying is so significant that in a crimi-

nal case curtailment of this right may amount to a denial of confrontation or due process rights." 3 J. Weinstein, Evidence § 607[03], p. 607-29; *Davis* v. *Alaska,* 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347 (1974). Therefore, a trial court must permit a defendant to present facts to the jury and allow the jury to draw inferences germane to the assessment of a witness' reliability. *Davis* v. *Alaska,* supra, 318; *State* v. *Arline,* supra.

Our resolution of this claim must comport with well established guidelines for determining whether a defendant's right of cross-examination has been unduly restricted. " '[W]e consider the nature of the excluded inquiry, whether the field of inquiry was adequately covered by other questions that were allowed, and the overall quality of the cross-examination viewed in relation to the issues actually litigated at trial.' " *State* v. *Santiago,* 224 Conn. 325, 331, 618 A.2d 32 (1992), quoting *State* v. *Roma,* 199 Conn. 110, 116, 505 A.2d 717 (1986). We also note that a trial court is accorded broad discretion when defining the appropriate scope of cross-examination. *State* v. *Santiago,* supra. The confrontation clause, however, requires that the trial court allow "all meaningful cross-examination into a legitimate area of inquiry . . . ." Id.

In this case, the defendant asks us to decide for the first time whether the ultimate success of a pending forfeiture proceeding is a legitimate area of inquiry on cross-examination. Although neither this court nor our Supreme Court has decided this precise issue, our Supreme Court recently addressed a similar matter in *State* v. *Santiago,* supra. There, defense counsel sought to establish a relationship between the state's witness and the Hartford police department to show bias. Id., 329–30. The court held that "[i]t is always relevant to the issue of bias that a witness may have a relationship to the prosecuting authorities in a criminal case."

Id., 332. Despite the possibility that the witness' relationship with the police may not have been "particularly illuminating of motive or bias," the court in *Santiago* held that "the weight to be accorded such evidence was a matter for the jury." Id.; *State* v. *Oehman,* 212 Conn. 325, 331–32, 562 A.2d 493 (1989).[9] Accordingly, the court reversed the conviction and remanded the case for a new trial.

Here, defense counsel sought to establish a relationship between Hoyt and the United States government that might have affected the jury's assessment of Hoyt's reliability as a witness. A guilty verdict would collaterally estop the defendant from disputing the facts supporting the conviction in the civil forfeiture action. See *United States* v. *Monkey,* 725 F.2d 1007, 1010 (5th Cir. 1984); *United States* v. *Land & Buildings Located at 420 Moon Hill Road,* 721 F. Sup. 1, 3 (D. Mass. 1988). Hoyt's testimony, if supportive of a guilty verdict, would benefit his employer, the United States government. Thus, the relationship between Hoyt and the United States government is relevant to the potential existence of bias. While the existence of a motive to distort the truth may be somewhat attenuated in this case, the weight to be accorded such evidence was a matter for the jury. *State* v. *Santiago,* supra.

Additionally, the trial court's ruling was phrased in such absolute terms that the defendant was unable to elicit any testimony from Hoyt that covered the field of inquiry at issue. In fact, the ruling reduced defense counsel's cross-examination to a brief inquiry into the prices of various grades of marihuana. Thus, we conclude that the trial court unduly narrowed the scope of the bias inquiry. See, e.g., *State* v. *Roma,* supra. In

[9] Cf. *State* v. *Milum,* 197 Conn. 602, 611, 500 A.2d 555 (1985) (holding that accused has right to cross-examine witness on issue of a witness' potential bias that stemmed from the fact that the witness had instituted a civil action for damages against the defendant arising from the crime charged).

the event that on remand the state calls as a witness Hoyt or anyone else with a similar relationship to the civil forfeiture proceeding, the defendant may examine that witness' potential bias stemming from involvement with the forfeiture action.[10]

V

We next consider the defendant's claim that the trial court improperly admitted evidence concerning firearms that the police found at her residence. As previously stated, the officers arresting the defendant had obtained a warrant to search the defendant's residence. Pursuant to the warrant, they seized several different guns. At trial, Losey, over objection, testified that the officers had seized these guns from the defendant's residence. The defendant contends that evidence pertaining to the presence of firearms was inadmissible because it was not relevant to the crime of attempted distribution of narcotics or the defense of entrapment.

The trial court is vested with wide discretion when considering whether evidence is relevant in a particular case. *State* v. *Boles,* 223 Conn. 535, 549, 613 A.2d 770 (1992); *State* v. *Echols,* 203 Conn. 385, 392, 524 A.2d 1143 (1987). Unless the trial court has abused its discretion or an injustice has occurred, a reviewing court will not reverse the trial court's evidentiary ruling. *State* v. *Boles,* supra. Evidence is relevant only if it has some "tendency to establish the existence of a material fact." (Internal quotations marks omitted.) *State* v. *Kelly,* 208 Conn. 365, 376, 545 A.2d 1048 (1988). "[T]he fact that evidence is susceptible of different explanations or would support various inferences does not affect its admissibility, although it obviously

---

[10] We note that the record is ambiguous with respect to the status of the federal forfeiture proceeding. It is, however, necessary to address this claim because, if the forfeiture action is pending at the time of retrial, Hoyt's potential bias may still be at issue.

bears upon its weight. So long as the evidence may reasonably be construed in such a manner that it would be relevant, it is admissible." (Internal quotation marks omitted.) *State* v. *Esposito,* 223 Conn. 299, 316, 613 A.2d 242 (1992); *State* v. *Joly,* 219 Conn. 234, 252, 593 A.2d 96 (1991).

In this case, we do not discern an abuse of discretion by the trial court. Our Supreme Court has noted that possession of firearms is common among drug traffickers. *State* v. *Delossantos,* 211 Conn. 258, 281, 559 A.2d 164, cert. denied, 493 U.S. 866, 110 S. Ct. 188, 107 L. Ed. 2d 142 (1989). Evidence of the presence of firearms at the defendant's residence, therefore, was properly submitted to the jury as a factor tending to show that the defendant kept firearms in connection with the attempted distribution of marihuana. While it may be true, as the defendant argues, that the defendant's husband used these guns solely for hunting, this was a question for the jury. Furthermore, it is not necessary that each piece of the state's evidence be susceptible of a single interpretation. Rather, the question is whether one possible interpretation tends to establish that the defendant intended to distribute drugs. We conclude that the trial court properly admitted the testimony of Losey relating to the presence of guns at the defendant's residence.

## VI

The defendant also contends that the trial court improperly precluded the admission of evidence that charges against the defendant associated with the presence of small quantities of marihuana at her residence had been dismissed. We disagree.

As previously stated, we accord broad discretion to the trial court when reviewing evidentiary rulings, particularly those involving the issue of relevancy. *State* v. *Boles,* supra. In this case, the court ruled that the

defendant could not present evidence that other criminal charges against her had been dismissed. Despite the defendant's argument to the contrary, the trial court properly ruled that this evidence was not relevant to the defendant's predisposition. This evidence does *not* tend to establish an entrapment. Instead, reference to these charges seems to cut against the defense since the fact that the defendant was actually charged with other crimes indicates the possibility of additional criminal acts. Furthermore, the defendant was permitted to introduce evidence that the defendant's husband accepted full responsibility for the prior charges against the defendant. Accordingly, we conclude that the trial court did not abuse its discretion in excluding evidence regarding the dismissal of other criminal charges.

## VII

The defendant's final argument is that the trial court improperly prohibited the defendant from inquiring into the attitudes of prospective jurors toward the defense of entrapment. We agree with the defendant.

In selecting the jury, defense counsel proposed to ask the following questions. (1) "Our defense is entrapment. That is, we'll be claiming that this is an action that the defendant would not have engaged in except for the actions of the undercover officer. Do you have any feelings about that?" (2) "Do you have any strong feelings one way or another about various law enforcement techniques, in particular about undercover investigations? That is, using police officers in order to act as if they're drug dealers in order to make an arrest?" The trial court sustained the state's objections to both questions and noted defense counsel's exception. The defendant claims that the trial court improperly excluded these lines of inquiry.

Our state constitution provides that in "all civil and criminal actions tried by a jury, the parties shall have the right to challenge jurors peremptorily, with the number of such challenges to be established by law." Conn. Const., art. I, § 19, as amended by art. IV of the amendments. In addition, the legislature has created a statutory right to a voir dire examination of each prospective juror in a criminal action. See General Statutes § 54-82f. Thus, it is well settled that "[t]he right to question each juror individually by counsel shall be inviolate. . . ." (Citations omitted; internal quotation marks omitted.) *State* v. *Couture*, 218 Conn. 309, 318, 589 A.2d 343 (1991), quoting *State* v. *Dolphin*, 203 Conn. 506, 511, 525 A.2d 509 (1987).

It is equally well established that "[t]he court has wide discretion in conducting the voir dire . . . and the exercise of that discretion will not constitute reversible error unless it has clearly been abused or harmful prejudice appears to have resulted." (Citations omitted.) *State* v. *Dahlgren*, 200 Conn. 586, 601, 512 A.2d 906 (1986). In defining the scope of voir dire examination, the court should allow an attorney ample latitude in questioning a prospective juror in order to ensure the discovery of prejudices that he may harbor, even those prejudices that " 'will even *subconsciously* affect [a prospective juror's] decision of the case . . . .' " (Emphasis added.) *State* v. *Dolphin*, supra, 512, quoting *State* v. *Higgs*, 143 Conn. 138, 142, 120 A.2d 152 (1956).[11]

In this case, the trial court did not abuse its discretion in prohibiting defense counsel from questioning

---

[11] We note that *State* v. *Dolphin*, 203 Conn. 506, 512, 525 A.2d 509 (1987), and its progeny are the only cases discussing the proper scope of voir dire when an attorney seeks to uncover a prospective juror's attitude toward law enforcement. Through this line of cases our Supreme Court established that when a police officer's testimony is crucial, a prospective juror's attitude toward the credibility of the officer is within the scope of voir dire.

prospective jurors on their attitudes toward undercover law enforcement. It is axiomatic that undercover law enforcement is an acceptable method by which criminals are apprehended. Whether a prospective juror generally favors such police practices is not pertinent to whether he or she harbors prejudices that might affect the fairness of the ultimate verdict. The trial court's discretionary ruling, therefore, was appropriate in this regard.

Defense counsel's attempt to ascertain the attitudes of potential jurors toward the defense of entrapment, however, is a different matter. The defense of entrapment goes to the heart of this case. Accordingly, the attitudes of potential jurors toward this defense is of critical importance to the defendant. It is conceivable that a juror would not accept the defense of entrapment even if convinced that an entrapment had occurred. Unless defense counsel distorts the essence of the entrapment defense, the trial court should allow the attorney to pursue this line of inquiry. *State* v. *Higgs,* supra.[12] On remand, defense counsel is entitled to greater latitude in conducting the voir dire to ensure that the jury ultimately empaneled is free of prejudices concerning the defense of entrapment.

The judgment is reversed and the case is remanded for a new trial in accordance with this opinion.

In this opinion the other judges concurred.

---

[12] See also *United States* v. *Dion,* 762 F.2d 674, 694 (8th Cir. 1985) (expressing reservations about trial court's limited voir dire regarding defense of entrapment), rev'd on other grounds, 476 U.S. 734, 106 S. Ct. 2216, 90 L. Ed. 2d 767 (1986); *United States* v. *Robinson,* 475 F.2d 376, 380 (D.C. Cir. 1973) (disapproving of trial court's refusal to question jurors regarding self-defense, but finding no prejudice in light of subsequent jury instruction).