[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
The defendant has filed Notice under Sec. 4059 of the Practice Book for a decision in conformity with said section on a Challenge to the Jury Array and a Motion or Motions in Limine. Because of the apparent confusion over the particular motion selected for argument in this scatter gun attack offered by the defendant in support of those motions, the court appends the transcripts of that hearing(s) and those arguments and incorporates them by reference herein
The Challenge to the Array
The defendant cites the United States Constitution, the Connecticut Constitution and various articles and clauses thereunder, cases, and certain Connecticut General Statutes. The essence of the claim is that the array is not representative of a fair cross section of the community. In order to establish a prima facie violation of the fair cross section requirement, the defendant must show (1) that the group alleged to be excluded is a "distinctive" group in the community; (2) that the representation of this group in venires from which juries are selected is not fair and reasonable in relation to the number of such persons in the community; and, (3) that this underrepresentation is due to systematic exclusion of the group in the jury selection process. When and if the defendant establishes this prima facie case, the burden then shifts to the State to prove that the selection system resulting in a nonrepresentative array furthers a significant state interest.Duren v. Missouri, 439 U.S. 357, 364, 99 S.Ct. 664,58 L.Ed.2d 579; State v. McCarthy, 197 Conn. 247, 250; State v. Castonguay,194 Conn. 416, 421-22. The defendant asserts that he is black and the State offers no argument or evidence to contradict his claim. As a black, he clearly falls within the "distinctive group in the CT Page 13624 community" requisite of Duren.
In addressing the second prong in determining whether the requirement of fair and reasonable representation of the group involved has been met, our courts have settled on the so-called "substantial impact" test as best suited to a fair cross section claim. Under this test, the "`focus is not on numbers and percentages but rather on whether the underrepresentation substantially affects the composition of the . . . [grand or petit] jury.'" See State v. Castonguay, supra; State v. Couture,194 Conn. 530, 552. Any disparity is measured in terms of its impact on juries, not simply percentages of the abstract. This analysis permits the courts to reject challenges when the challenged practices do not significantly alter the composition of the typical grand or petit jury.
It seems appropriate at this point to categorize this challenge as exactly what it is and that is an Equal Protection claim which is limited to members of the so-called excluded group. State v. McCarthy, supra, 197 Conn. 251 n. 5. The defendant has called two witnesses, the State Jury Administrator and Jury Pool Officer of this District. The testimony of the Administrator proved to be quite innocuous with respect to the challenge being asserted. The Jury Pool Officer's testimony hardly strengthened that of the Administrator. While the first prong of Duren, was concededly satisfied, the second and third, as they exist in Connecticut, have by no stretch of the imagination or magical incantation approached the threshold of establishing a prima facie case, and further analysis or comment is hardly necessary. In spite of that finding, the court must comment upon the content of the so-called challenge to the array which sets forth certain factual predicates and arguments upon evidence which was never introduced. He has chosen to include factual claims in a "motion" which in reality is a combination "motion" and memorandum of support thereof, and is hardly the equivalent of evidence. In addition thereto, his reminder to the court of its powers of judicial notice does not, in fact, establish that judicial notice. Such reminder avails him nothing.
The court must also comment upon being urged to adopt a dissenting opinion in the State v. Robinson, 227 Conn. 711, which this court refuses to do. Finally, he requested the court to inquire of each day's array how many members claim to be of black or hispanic origin. This request has been consistently denied by this court. The basis of the request is and was to preclude the CT Page 13625 panel, in his words, from HOLDING IT AGAINST ME OR MY CLIENT.
(Emphasis added.) This request and the finding to be made as a result of such inquiry would certainly challenge the court's impartiality and integrity. By such inquiry, the court becomes an ally by siding with one of the adversaries in the proceeding before it. The impropriety of such a posture deserves no further comment.
The challenge to the array, accordingly, is denied.
The Motion in Limine 2
The defendant's Motion in Limine, which is numbered two (2), begins rather unimpressively with reference to the wrong defendant. The pertinent part, the objectionable portion as expressed by counsel recites" . . . hereby moves this honorable court to refrain from exposing the jury arrays to the type of questions likely to be asked by counsel upon individual voir dire because such preexposure to likely questions by counsel will I allow potential jurors so disposed to prepare answers that MAY
[emphasis added] interfere with counsel's ability to determine beliefs, predispositions, emotional response systems and prejudgments." The so-called exposure occurs at the introduction of the case to the jury array. At any such introduction, it is the practice of this court to explain fundamental principles of both civil and criminal law to the prospective jurors. The jury is always cautioned that it is not the court's intention to change opinions, predispositions that they may have, beliefs or any emotional responses, if indeed such a state of mind exists in any juror. Essentially, such explanation is followed by a question to the effect that, is there anyone here who cannot accept and follow that instruction as given by the court? If such preliminary instruction expressed to any prospective panel violates any known principle of law, this motion should prove the vehicle for such an opinion from a reviewing panel.
The defendant draws what he believes to be support for his proposition, general reference to the State Constitution, to a General Statute and to the State v. Lee, 30 Conn. App. 470, 491. These general citations stand for the proposition that "it is well settled that `the right to question each juror individually by counsel shall be inviolate . . . .'"
It is interesting and ironic that Lee continued on to say "[i]t is equally well established that `the court has wide CT Page 13626 discretion in conducting voir dire . . . and the exercise of that discretion will not constitute reversible error unless it has clearly been abused or harmful prejudice appears to have resulted.' (Citations omitted). In defining the scope of voir dire examination, the court shall allow an attorney ample latitude in questioning a prospective juror in order to ensure the discovery of prejudices that he may harbor, even those prejudices that `will even subconsciously' [emphasis in original] affect [a prospective juror's] decision in the case . . . .'" Statev. Lee, supra.
Once again, it should be noted that the Motion in Limine attacks the court's introduction of the case to the panel, not voir dire. The only limitation the court has ever placed on voir dire is consistent with State v. Dahlgren and State v. Oldread,200 Conn. 586, 598-99.
The Motion in Limine two (2) is, accordingly, denied.
Moraghan, J.
DOCKET NO. CR-93-086882
STATE OF CONNECTICUT,
PLAINTIFF, SUPERIOR COURT OF CONNECTICUT
-VS- JUDICIAL DISTRICT OF DANBURY
NATHANIEL FAUST, JANUARY 24, 1995.
DEFENDANT.
BEFORE:
THE HONORABLE HOWARD J. MORAGHAN, JUDGE
APPEARANCES:
 STATE'S ATTORNEY'S OFFICE BY: PATRICIA GILBERT, ESQUIRE 146 White Street Danbury, Connecticut 06810 ATTORNEY FOR THE PLAINTIFF CT Page 13627 PUBLIC DEFENDER'S OFFICE BY: MICHAEL COURTNEY, ESQUIRE 146 White Street Danbury, Connecticut 06810 ATTORNEY FOR THE DEFENDANT
 Lauren Freitas Court Monitor
MS. GILBERT: Oh.
MR. COURTNEY: Excuse me, Your Honor. Number 2.
MS. GILBERT: This?
MR. COURTNEY: No, not that one.
MS. GILBERT: Number 2?
MR. COURTNEY: Yes, this one.
MS. GILBERT: What's this?
MR. COURTNEY: That's the different motion in limine.
That's the other one. This is Number 2. What we're doing is just substituting —
MS. GILBERT: Okay. Are we — are you substituting Number 2 for the October 31st, 94 —
MR. COURTNEY: No, for the record, there are two motion in limine's. One of them is addressed to his prior convictions, the other one is addressed to the Court and the introductory to the jury panel.
MS. GILBERT: Oh.
MR. COURTNEY: The motion in limine with the 2, not numeral — not Roman numeral 2 is the one we're dealing with right now. And I'm asking the Court to let the record reflect —
THE COURT: Wait just a moment until she has it. CT Page 13628
MS. GILBERT: Okay. Is motion in limine 2 that's being withdrawn the one that refers in the captions to Nathaniel Faust but in the paragraph to Scott Walton?
MS. COURTNEY: Exactly. The earlier one.
MS. GILBERT: Okay. October 26th, 1994, I have no objection to that being withdrawn.
THE COURT: Very well.
MR. COURTNEY: And, Your Honor, if the Court, please, that's my motion and we can address that right now, if the Court please.
THE COURT: All right.
MR. COURTNEY: Do you want to examine it?
THE COURT: I'm sorry?
MR. COURTNEY: Do you want to examine it? It's addressed to you, not to the State's Attorney.
THE COURT: January 4th in Number 2?
MR. COURTNEY: Yes.
THE COURT: Yes.
MR. COURTNEY: What I'm trying to avoid, Your Honor, and I can indicate that this motion has already been denied in this courthouse twice, is the practice of many Courts to go into the jury room and say you're likely to be asked do you have anything against police officers or do you have anything against black people, in other words, the questions that I would typically ask or that Ms. Gilbert would typically ask, I don't know if she would join me in this motion, but it's more of a matter of — I would rather ask these things myself because my right to question — his right to question jurors in — by themselves is in violate and when you expose a group of people —
THE COURT: And how does that in any way — how is CT Page 13629 that impinged in any way by the Courts asking general questions of a bias, prejudice or interest?
MR. COURTNEY: Because it seems to me that when they hear the questions and they're very similar to the questions that they're going to be asked when they come in this room individually, they have a pre-exposure to the questions and therefore they can develop a pre-answer. Rather than me having an off-the-cuff answer I have something that may well have gone on in their minds and they have prepared when they get the question.
So I recognize that the Courts' control over the jury is subject to tremendous amount of discretion, but I have always been troubled by this policy and I felt it appropriate to file a motion and ask the Court not to do it.
MS. GILBERT: The State does not join in the motion, Your Honor, just so that the Court is clear.
THE COURT: And?
MS. GILBERT: Well, it's — it's rather vaguely worded, but I think that obviously, Your Honor should be the only one asking questions about certain issues of law such as those set forth in Dalgrin (phonetic). I don't even know what kind of questions, really, Mr. Courtney is talking about. I did look at State versus Lee because Mr. Courtney relies on it and I think that's a very different case, it was a specific issue that the Court dealt with on questions to perspective jurors about the defense of entrapment. Mr. Courtney hasn't specified anything here, I — I don't see that there's anything to the motion and I would ask Your Honor to deny it.
MR. COURTNEY: It's not directed to the State's Attorney, it's directed to Your Honor.
THE COURT: Does that change the fact that nothing to the motion has been presented here?
MR. COURTNEY: There's nothing to the motion in view of the fact that there is no case that says you can't do it, but there is constitutional and statutory authority CT Page 13630 that my right or his right to question jurors individually is inviolate. And it would seem to me that exposing —
THE COURT: I think I asked you that question before and it's almost a fortiori (phonetic) at this point. The fact that the Court may ask it initially means it's your right to subsequently ask it in some way impinged upon by allowing them an opportunity to conceive an answer.
MR. COURTNEY: Exactly, Judge. It's more like the Federal system perhaps, where the Judge asks them all at one time the same questions, so, it troubles me and I filed a motion.
THE COURT: Mr. Courtney, you have no idea how upset I become when your troubled, but that doesn't add any substance to this motion, it's denied.
MR. COURTNEY: The next motion is the motion in limine, Your Honor, which has — it's regarding Mr. Faust's prior criminal record. Now, the problem with this criminal record is it is in some what of a dispute right now.
THE COURT: Excuse me. Just a moment, please.
MR. COURTNEY: I'm sorry.
THE COURT: This shows Rosemarie Chapdelaine is his counsel. Is this the motion I'm suppose to see?
MR. COURTNEY: Ah, yes, the January 4th will be substituting for the October 31st.
THE COURT: Do you have the January 4th motion?
THE CLERK: No, I do not.
MR. COURTNEY: Oh, I'm sorry, it's right here.
THE COURT: I thought you had given it to him, or tried to. Is this the one you agreed to, Counselor?
MS. GILBERT: I didn't agree to the substance of it, Your Honor. CT Page 13631
THE COURT: You agreed to the substitution of it?
MS. GILBERT: Yes.
THE COURT: I believe.
MS. GILBERT: Yes. Your Honor, just — if I could point out before we embark on argument with respect to this particular motion, Mrs. Larkin has my sub-file and the defendant's prior record right now, I have her veryifying out of state convictions, so I may be somewhat hampered in my ability to respond.
THE COURT: And?
MS. GILBERT: Perhaps if Inspector Mahoney could get that file for me, by the time Mr. Courtney finishes maybe it will be here.
THE COURT: Yes, Mr. Courtney?
MR. COURTNEY: Your Honor, this motion is based on a criminal record that was disclosed to me by the State's Attorney's Office. I also asked for the defendant's criminal record from the State Police and I received the same print-out back. I sent that print-out to the Superior Court Record Center and they indicated that they only have three convictions on file for him. I gave this information to Ms. Gilbert last week, so as far as I know right now, as far as Connecticut is concerned, there are only three convictions. One of them is a Robbery 2d 2 /28/86, sentencing 4/7/86, the other is a Robbery 1st, 2/28/86, sentencing 4/7/86 —
THE COURT: How about Robbert 2 in 83'?
MR. COURTNEY: Well, see this motion is based on what the State provided to me, but the record center says they don't have these convictions they only have three. Now I asked Ms. Gilbert to confirm or deny whether there are other convictions that she intends to rely on, but at this point I am only aware of the three based on the records sent from Enfield and the documentation I gave her I don't know if she's got anything else in Connecticut. CT Page 13632 My understanding is that the State Police may have put this or whoever put these records into the computer that they don't necessarily reflect —
THE COURT: I only heard you mention two, I thought, Mr. Courtney?
MR. COURTNEY: There's a third on. A third Robbery 1. I can't find the exact date on it.
THE COURT: A duplication of the 86', that same Robbery 1 type charge?
MR. COURTNEY: Excuse me one moment, Your Honor. It looks like April 7th of 86', Robbery in the first degree.
THE COURT: Well you have that one. Robbery in the 2nd degree, now where's the third one you're talking about?
MR. COURTNEY: Excuse me, Your Honor. They say there are three — there are three mitimus's in his correctional file for Robbery although I don't have any documentation as to the third one aside from this mitimus which is accessory to Robbery in the 3rd degree, 1/31 — in the second degree, 1/31/84, date of sentencing 3/5/84. So you have a Robbery 1 and a Robbery 2 sentencing 4/7 of 86', and accessory to Robbery in the 2d 3/5/84 in his correctional file together with a violation of probation. So, in general I rely on the State Police print-out. His correctional file doesn't seem to have those mitimus' if they sent me the correct correctional file. The record center in Enfield doesn't seem to have other convictions besides those three, so I've given this all to Ms. Gilbert and maybe we can at least figure out how many convictions she intends to rely on.
MS. GILBERT: Are you done?
MR. COURTNEY: Yes.
MS. GILBERT: Your Honor, perhaps while we await the arrival of the file I could just respond in general to the motion. I think that Mr. Courtney takes black letter law from Nardini and makes it Paragraph 2 of this motion. CT Page 13633 If one looks more carefully at Nardini, however, we should be aware that there are factors set forth about prejudice with respect to prior convictions. And those factors are whether the prior conviction is quite similar to the offense for which the defendant is currently being tried, That's not applicable in the instant case. If we're relying on Robbery convictions and he's currently charged with assault on an employee of the Department of Corrections and Rioting.
Second factor is the significance of the particular crime, prior conviction, in indicating the defendant's untruthfulness, and that's very applicable in this case because the Courts' agree that "lying type crimes", if I could put that lying crimes in quotes, go directly to credibility and Nardini discusses that in detail. Robbery is a "lying type crimes" because it includes the taking of personal property from another. So I think that the convictions are significant, the names of the crimes of which he was convicted. The other Nardini factor is remoteness in time, these convictions for the most part are within 10 years. If there is an 84' conviction it's barely over ten years old.
Again, Mr. Courtney relies on State versus Guyer for the proposition that the prejudicial value, and this is Paragraph 3, of the introduction of those prior convictions far out weighs its probative value on this issue of credibility, and again I disagree with that reading of Guyer. Guyer says that crimes involving larcenous intent imply a general disposition toward dishonesty. And the facts are very different in Guyer as well. In Guyer the defendant was on trial for narcotics charges and the convictions that were at issue were narcotics convictions which may have established a pattern of chronic disregard for the narcotics laws particularly.
The reliance on State versus Wright is also misplaced. Again, because of the factual difference. In Wright the defendant was being tried for manslaughter and the Trial Court admitted the defendant's manslaughter conviction as well as various assault convictions. Obviously, manslaughter more than quite similar in nature, exactly the same as the crime for which he was then being CT Page 13634 tried.
And the reliance on Section 52-145 of the Connecticut General Statutes is misplaced because that has nothing to do with what's set forth in Paragraph 3, the prejudicial value out weighing the probative value. 52-145 merely says that conviction of a crime does not disqualify one from being a witness, it has nothing to do with prior convictions or credibility.
I would object to the — well, I'll take this one at a time, the first request is that the — apparently in Paragraph 9 that the Court prevent the State from referring to prior convictions at all, I think that's what it says, and then Number 10 is in the alternative, the defense requests that if I'm allowed to refer to prior convictions it be only unspecified felonies, and again I would object to that because of the language in Guyer which authorizes unspecified felony convictions where the prior crime doesn't go directly to credibility and the defendant's prior convictions do go directly to credibility because of the larcenous intent.
I will be able to be more specific about the number of crimes when Mr. — Inspector Mahoney gets here with the file. I am verifying or Mrs. Larkin was attempting to verify with Massachusetts the defendant's out-of-state convictions. I believe that at least one of the two is a felony but I would like to be sure before I make that representation.
MR. COURTNEY: Your Honor, I don't have to educate you on the law, this is a discretionary motion. If you keep them out they stay out, if you don't keep them out they come in. At least one them, the one's I've given you is over ten years old. The other two are close to being over ten years old, but — but I'm asking what convictions are you relying on — relying on Madam State's Attorney, 21 months after he's been arrested. If I relied on the records that she gave me I'd be looking at nine felony convictions here that he has. So I think she has an obligation to tell me what convictions this man has. I've done everything I can to find out and I can't get an answer — a straight answer. CT Page 13635
MS. GILBERT: I thought I had addressed that twice when I said — or maybe three times, when I said that Inspector Mahoney was getting the file and that Mrs. Larkin is verifying with Massachusetts whether one of — both of those convictions are felonies.
MR. COURTNEY: Are we then agreeing that he has three felonies in Connecticut and none others?
THE COURT: I don't think she can answer that for you.
MR. COURTNEY: Well I'd ask the Court to order her to answer that question because I have no means of finding out.
THE COURT: There will be no such order until the file arrives, if it does arrive ever.
MR. COURTNEY: I thought —
THE COURT: Did Inspector Mahoney go to lunch?
MS. GILBERT: No, Your Honor.
MR. COURTNEY: I'm sorry, I thought the file was just to look up Massachusetts. I thought we already knew about Connecticut.
MS. GILBERT: No. I specifically said that Mrs. Larkin has my sub-file on the defendant's prior record.
THE COURT: That's what I understood you to say. All right, what else do you have, we will reserve decision on that until Attorney — Inspector Mahoney appears, if he ever does.
MR. COURTNEY: Your Honor, there's a motion to dismiss in the file or actually two of them. At this point I'm withdrawing them both, January 6th, 1994 and October 31st, 1994.
THE COURT: Why?
MR. COURTNEY: Because I can't find anything — the CT Page 13636 actual grounds for dismissal are in the second motion and I am unable to find anything within his correctional file that indicates he's been punished already for this particular charge. Generally there is punishment inflicted at least, to me, double jeopardy type punishment, but in this particular case there apparently have not.
In the first motion, I cannot find anything at this point, I am unaware of anything that involves the arrest which would have padded the (unintelligible) of this prosecution.
There is a motion to suppress statements. I am aware of only one exculpatory statement that was given to Detective Halpin (phonetic). I would ask for an offer of proof when he testifies because it is in fact, an open file.
THE COURT: Well, here again, I'm not going to rule on these things that are coming up in the course of the trial, Mr. Courtney.
MR. COURTNEY: I'm sorry, Your Honor?
THE COURT: I'm not — I don't have any intention of ruling on matters that are coming up in the course of trial, such as offers of proof, awarding you such an offer, no way.
MR. COURTNEY: I think the Court — well, I'd ask the Court to realize that this is an open file supposedly —
THE COURT: Hm-mmm.
MR. COURTNEY: And I have been relying on Ms. Gilbert to give me discovery. I got two statements of witnesses yesterday. I am waiting for things that she has gotten from corrections today. There are three or four witnesses, I think at least three witnesses on the witness list with — I have no reports from them. So, in this particular case as far as a motion to supress his statements I think she has an obligation to tell me if she has some statements of any kind other than the ones I already have. CT Page 13637
MS. GILBERT: Statements of whom? The defendant?
MR. COURTNEY: The defendant.
MS. GILBERT: Your Honor, the reports and statements that I have have been given to MR. Courtney. Yes, when I received two Department of Corrections incident reports by fax yesterday, I hand delivered them to Mr. Courtney. And in accordance with my duty, I will continue to provide to him whatever I learn if it's discoverable and if it's in accordance with the open file policy as I learn it, which is what I have been doing.
Just for the record, was that on a motion that I failed to mark somehow, or was that oral?
THE COURT: It's a motion to suppress dated January 6th, 1994.
MS. GILBERT: Is that the only motion to suppress, Mr. Courtney?
MR. COURTNEY: We're not finished with that one.
THE COURT: We're not doing this one now?
MR. COURTNEY: No, I'm waiting for you to read it.
THE COURT: I have read it.
MR. COURTNEY: What I'm trying — the point I'm trying to make is that I don't know of any statements that he made that are suppressable or inculpatory. But if something comes up I want them to be introduced outside the presence of the jury.
THE COURT: That's not worthy of being ruled upon now.
MR. COURTNEY: There is a motion to suppress tangible evidence, and again, Your Honor, I am unaware of any evidence that was seized that that motion could be addressed to. Again, basically open file policy. CT Page 13638
THE COURT: Here again, if you go before the Court, it won't rule on it.
MR. COURTNEY: Well I'm asking the Court to do this.
THE COURT: You're asking me to conduct a discovery for you today, pretty much is what I can see, and I'm not going to do it for you.
MR. COURTNEY: Okay. Well then, can I explain this to the Court? In this case I have all along relied on open file. There is a — three separate files that we're dealing with here. The State Police conducted an investigation, the Correctional Department conducted an investigation, and then you have Ms. Gilberts' file. To me, what Ms. Gilbert gains access to from the Correctional Department files should be part of my open file. She does not seem to agree with that proposition and the fact of the matter is, is that the discovery keeps dribbling, dribbling, dribbling, and I'm concerned.
Originally in this case I subpoenaed the video tapes of the incident with an agreement with the State's Attorney that we would secure these video tapes for my viewing. The video tapes were the — both the State Police and Garner Correctional indicated to me that the video tapes of the incident are in the State's Attorney's Office. We viewed those video tapes. As it turns out there is another video tape besides the one's that the State's Attorney has. Whether Ms. Gilbert has seen that or not I don't know. Whether it relates to this incident or not I don't know. My problem is, if Ms. Gilbert feels that nothing that she is able to view in the Correctional Department files is going to me then I need somebody to give me access to those files. If I can rely on the State's Attorney to say that there is no exculpatory information, I have reviewed all the State Police files, I've reviewed all the Correctional Officer's files, then maybe I'm stuck. But at this point, I don't know where I stand as far as those files are concerned. Whether she's reviewed them, whether there's anything exculpatory in there, whether there are things that have been held back from both her office and the State Police.
THE COURT: Counselor, is there a third tape? CT Page 13639
MS. GILBERT: With respect to this defendant, Your Honor?
THE COURT: I think so.
MS. GILBERT: That's my problem with all these statements. Mr. Courtney has been interrogating me probably for four — probably four weeks with respect to incidents that occurred at Garner on April 21st, 1993, some seven hours after the crimes for which I've charged this defendant. That's not relevant to this case.
THE COURT: That's your position.
MS. GILBERT: Anything that happened after a certain point early on in the evening of April 21st, 1993, yes, my position is it's not relevant to this defendant, it's not discoverable. Because of Mr. Courtney's interrogation and because of his suggestions, allegations that there was other material, I have contacted Corrections. Anything I've discovered with respect to this defendant, the only one he represents, I have and will continue to turn over to him, if it's discoverable. I will not share what would be considered work product.
THE COURT: I have and will continue to turn over — you've given him those tapes already, is that what you're saying, you've shown them already?
MS. GILBERT: I gave him the tapes that are possibly relevant to this defendant. Tapes that were made hours later in a different part of the facility I claim are not relevant and not discoverable.
THE COURT: Do they involve him?
MS. GILBERT: No.
THE COURT: Mr. Courtney?
MR. COURTNEY: Now, is the State's Attorney representing that she has seen all of the tapes — no, let me withdraw that. Here's my problem, Judge, I don't necessarily trust the Correctional Department to turn CT Page 13640 over everything that might be exculpatory. I have no right to force them under any discovery rule to turn things over. They're not a party to this particular proceeding. I have subpoenaed the Director of Security, I have asked him to bring, if the Court orders him to come here, all of the tapes of that particular evening. And also, all of the Correctional Department investigation that went into that riot. If — if the State's —
THE COURT: That went into that what?
MR. COURTNEY: All of the investigation that went into that riot —
THE COURT: Riot.
MR. COURTNEY: The investigation reports that went into the riot. The warden tells me if you want something talk to security. The State's Attorney tells me you've got everything I have. How do I know there is nothing in there that might possibly help this man in an identification case. And how do I order them in here when they are not subject to discovery.
THE COURT: Identifying whom?
MR. COURTNEY: This man.
THE COURT: Identifying him?
MR. COURTNEY: Identifying him.
THE COURT: Is identification an issue in this case?
MR. COURTNEY: Identification is an issue to me.
THE COURT: To you?
MR. COURTNEY: Yes.
THE COURT: Well of course it's an issue in every case to you. The whole case is an issue to you.
MR. COURTNEY: Well not necessarily. CT Page 13641
THE COURT: No, Mr. Courtney. If she represents you got the tapes on this file that are relevant than I'm satisfied you have.
MR. COURTNEY: Well how about — how do I get into the Correctional files if Ms. Gilbert will not go in there and look through them for what might be exculpatory to me. The State's Attorney is allowed to charge that at or around seven o'clock he rioted and he assaulted a Correctional Officer. And to tell me that some things are relevant and some things not, but with no representation to either me or the Court that she has reviewed everything that impacts on that particular time. This was not some little incident, Judge. This was that big riot back in April of 93'. This is the first case that's gone this far. They have to have all kinds of stuff that they will not give. I have them under subpoena. I am dealing with the Attorney General's Office and I told them that I would bring this to your attention and I will not bring this man down here with these materials unless you order him to come, because if you think this is a fishing expedition then I suppose that's how you're going to rule. But I have no ability to force him to give me things that may well be exculpatory to my client. And I have no assurance that the State's Attorney has reviewed —
THE COURT: Perhaps you can enlighten me as to how my ruling is going to make any difference except their going to have to do it then you can't get by subpoena and see it before and get to it.
MR. COURTNEY: I can't see it unless they come down here and what's going to happen is I'm going to tell them this is the date the Judge wants you down here, they're going to file a motion to quash the subpoena and —
THE COURT: Well you issued a subpoena, have you not a subpoena?
MR. COURTNEY: I issued a subpoena but it is a subpoena for discovery because I can't just put this man on the witness stand during the jury trial and say give me those tapes, give me all those correctional reports. So, yes, I am asking you to order that I have access to the correctional Department investigation in this case. CT Page 13642 To order that I have access to the original video tapes.
THE COURT: Anything else?
MR. COURTNEY: No, your Honor.
THE COURT: Yes?
MS. GILBERT: I don't know what Your Honor is inclined to do. I would ask if Your Honor is inclined to order that a public defender has access to some other state agencies internal investigation that an Attorney representing that agency be allowed to he here to argue on their behalf. Any ability that I may have to do so would be limited because I don't represent the agency.
My representation to this Court is that the evidence will show that the defendant assaulted a Corrections Officer, and participated in rioting early on in the evening of April 21st. That shortly thereafter, the defendant along with most of the other inmates at Garner was locked down.
Mr. Courtney's comments and interrogation and badgering goes to an incident he claims happened hours later, in a different part of the facility. I will not — if — I will not represent that I have looked at every single video tape that was made at Garner on that night. If it had to do with a certain cell block in which there were no Corrections Officers until many hours after I've charged this — the crime with which I've charged this defendant, then no, I have not reviewed those. If Your Honor wants me to watch those tapes in their entirety, because I can't say I've watched them in their entirety, and if Your Honor orders me to do that, obviously I will follow Your Honors order. I don't see the relevance of anything that occurred after this defendant was secured.
I think that the requests are indeed a fishing expedition because Garner has ten housing units not all of which in April of 93' were used for housing, each of which had probably — each of those which was used for housing had probably 75 to 85 inmates. Fishing expedition — looking for anything that could be relevant. There's no — there's no greater example of a fishing CT Page 13643 expedition.
THE COURT: Mr. Courtney, would you like to conclude?
MR. COURTNEY: Your Honor, this was a riot. It was cast. There is a significant investigation which Ms. Gilbert has not, I don't think, seen all of it. I originally filed a motion to provide copies of these video tapes back in April 5th of 1994. And the motion as I remember it was granted by my viewing the tapes. I think that was the agreement.
THE COURT: It's off without prejudice according to the —
MR. COURTNEY: Okay. If it's off without prejudice it was resolved by my viewing of the tapes. So I viewed the tapes and then I viewed them again last week and then I discovered that there was another tape which the State's Attorney did not have. In this file, if Ms. Gilbert will agree, that the witnesses who identified him put him in a particular set of clothing. If there is another tape where he is on there in another set of clothing or a different clothing wouldn't that be exculpatory and if Ms. Gilbert has not reviewed these tapes, how would she know whether that in fact did occur?
THE COURT: This is several hours later?
MR. COURTNEY: I don't know that, Judge. I'm not relying on Correction. You see that motion. The Commissioner himself said there was all kinds of things going on there. Well, it don't sound to good to me. And if I — I — I subpoenaed these tapes originally and I did that in front of Judge Riefberg on February 18th of 1994, I said I'm requesting a three week continuance, I attempt to subpoena the State Police and the Correctional Institution and video tape which I believe exists, I was informed the State's Attorney's got it all. And it turns out that that's not the case because I've seen at least one other tape. So, I believe somebody has to look at these tapes, somebody has to look through these files, I will be happy to do it but at least if Ms. Gilbert does it and represents there's nothing exculpatory I know that my CT Page 13644 client will be covered.
THE COURT: All right, thank you. Mr. Courtney you're fishing purely and simply. That's denied. Now is there anything else today before we go to lunch and are you occupied this afternoon? I believe you are, aren't you?
MS. GILBERT: I'm sorry, Your Honor, is that addressed to me?
THE COURT: Yes. Are you occupied this afternoon?
MS. GILBERT: I would like to be, yes.
THE COURT: All right. And tomorrow morning you have something and should conclude by 10:30?
MS. GILBERT: I hope so.
THE COURT: All right. We'll resume this tomorrow morning at 10:30. When do you intend to file your motion to Charles D. Ray's file, when do you intend to argue it?
MR. COURTNEY: I'll have my witness here at 10:30 Judge. Usually it takes about an hour. The State's Attorney —
THE COURT: Before we see the Judge — before we see the jury, excuse me.
MR. COURTNEY: I would say so, yes, Your Honor.
THE COURT: All right. All right we'll resume at 10:30. Is this the only motion we haven't covered today?
DOCKET NO.
STATE OF CONNECTICUT STATE OF CONNECTICUT
JUDICIAL DISTRICT of DANBURY
-VS- AT DANBURY
JANUARY 25, 1995 CT Page 13645
NATHANIEL FAUST
BEFORE:
THE HONORABLE HOWARD J. MORAGHAN, JUDGE
APPEARANCES:
 PATRICIA M. GILBERT, ESQUIRE ASSISTANT STATE'S ATTORNEY 146 White Street Danbury, Connecticut 06810 ATTORNEY FOR THE STATE OF CONNECTICUT
 MICHAEL K. COURTNEY, ESQUIRE ASSISTANT PUBLIC DEFENDER 146 White Street Danbury, Connecticut 06810 ATTORNEY FOR THE DEFENDANT
 Theodore C. Setaro, Jr. Court Monitor
 THE COURT OFFICER: Oyez, Oyez, Oyez, the Honorable Superior Court, in and for the Judicial District of Danbury is now open and in session. All persons having causes or actions now pending before said session shall give their attention according to law.
The Honorable Howard J. Moraghan, Judge, presiding.
Please be seated.
THE COURT: Good morning.
MR. COURTNEY: Good morning, Your Honor.
MS. GILBERT: Good morning, Your Honor.
THE COURT: Yes?
 MR. COURTNEY: Your Honor, I'd just received a bill of particulars with which I'm not satisfied, but, if the Court please, I have a witness from Hartford on my CT Page 13646 motion to challenge the jury array. If I — If I can, I'd like to get him out of here.
 THE COURT: I think that would be very commendable, Mr. Courtney.
 MR. COURTNEY: Unless the Court wants to see the bill of particulars first. I'd kind of like the chance to look at it and look at the cases anyway, once we finish this motion to make sure — Make the Court aware of all of my objections to it.
THE COURT: Fine.
Proceed.
MR. COURTNEY: Mr. Gayer.
Yes.
 If I may, Your Honor, these Correctional Officers were not aware of the Court's order regarding the shackles.
THE COURT: Would you remove them, please?
THE CORRECTIONAL OFFICER: The legs?
Let me see.
 THE CLERK: Would you raise your right hand, please?
 Do you solemnly swear that the evidence you shall give concerning the case now in question, shall be the truth, the whole truth, and nothing but the truth, so help you God?
THE WITNESS: I do.
 THE CLERK: Would you please state your name and business address, spelling your last name, please?
 THE WITNESS: My name is Richard J. Gayer, G-a-y-e-r, Jury Administrator for the State of Connecticut, 340 CT Page 13647 Capitol Avenue, Hartford, Connecticut.
THE CLERK: Thank you.
 THE COURT: Gentlemen, if at anytime while you're here, something occurs that disturbs you, and you think it's necessary to shackle him, you don't have to ask permission. You just do it.
THE CORRECTIONS OFFICER: Yes, sir.
THE CORRECTIONS OFFICER: Thank you. Thank you.
DIRECT EXAMINATION BY MR. COURTNEY:
Q Mr. Gayer, could you tell the Court who you work for?
What is this, exactly, that you do?
 THE COURT: I didn't hear you. Two questions pending, I think.
MR. COURTNEY: I'm sorry, Your Honor.
BY MR. COURTNEY:
 Q Could you tell the Court who it is that you work for and exactly what you do?
 A I work for the Chief Court Administrator. My job is to prepare a master file of jurors to satisfy the needs of the Court for — for the Court — for the Court year involved.
Q For the State of Connecticut, in general?
A Yes. That's —
Q And — And you're duties and powers is specified in
 General Statutes 51-219a as the Jury Administrator for the State of Connecticut?
A That is correct.
Q And how long have you been the jury administrator for CT Page 13648 the State of Connecticut, Mr. Gayer?
A Roughly about four years.
Q And prior to that, did you work in jury administration?
A Yes. I was the Assistant Jury Administrator since 1984.
Q So, you've been with jury administration since 1984?
A That is correct.
 Q And, Mr. Gayer, is it fair to say that you pick the people who are eventually going to be summoned to serve on juries, pursuant to Chapter 884 of the General Statutes?
 MS. GILBERT: Your Honor, I'm going to object beyond this preliminary matter — matters about background and ask that Mr. Courtney refrain from leading questions.
THE COURT: Mr. Courtney, leading questions?
MS. GILBERT: I was surprised too, Your Honor, but
—
THE COURT: That's incredible.
MS. GILBERT: Yeah, I know.
THE COURT: The objection is sustained.
 MR. COURTNEY: If I may, Your Honor, okay, I don't think there's any real dispute about these questions or the answers to them.
THE COURT: Except there's an objection pending —
MR. COURTNEY: I understand, but —
 THE COURT: (Continuing) — on a leading question, which is sustained.
 BY MR. COURTNEY:
CT Page 13649
 Q Mr. Gayer, could you tell the Court pursuant to what General Statutes do you act when you summon people for jury service within this state?
 A Based on Chapter 884, starting with Section 51-217
through Section 51-247c.
 Q And could you tell us how that process works from beginning to end?
 A Well, basically, it all starts with the needs of the court. They project a calendar need — Court Calendar need — court — for the court here, and based on those figures, I determine the amount that will be needed to allow me to have those people confirmed for a particular days of court — when court's in session.
 The number that I build in the Master File is taken from both the Voter Registrar and the Motor Vehicle combined. It's all done randomly. I get listings from the Voter Registrar and I also do — do have a direct access to the Motor Vehicle file to supplement the names from the Voter Registrar.
 Q Now, these listing you get from the Voter Registrar, are they from town jury committees or directly from the Registrar of Voters?
 A They're — They're from the Registrar but they're requested by a jury committee.
Q Okay. And —
 THE COURT: I'm sorry. From the Registrars for what?
 THE WITNESS: By a jury committee. BY MR. COURTNEY:
 Q And the calendar that you get, who — Who projects the Court Calendar for a specific court location for year to you?
 A That — That varies. It's — It can go anywhere from a — a Chief Clerk to a Trial Court Administrator to a Jury Poll Officer. I think that all three are combined in the effort. CT Page 13650
 Q And when do you get these calendar requests for a particular jury year?
 A I get them about a year in advance of the court year itself, so that I can have time to go out to the towns and build a master file.
 Q And the — The court year itself, is that a calendar year. What — What is a "court year"?
 A A court year begins in September 1st and ends in August 31st of the next year.
 Q And the court year that we're currently in began in September of '94 —
A That is —
Q (Continuing) — and goes to August 31st of '95?
A That — That is correct. Yes.
 Q Now, specifically for the Judicial District of Danbury, did you summon a number of people to appear here in this Judicial District for jury service this year?
A Yes, I have.
 Q And do you know what that number of people is for the whole year?
 A For the whole year? Yes. I built a master file of 22,762 people.
 Q And could you describe for us how it is that you notify these people that they need to come for jury service?
 A Prior to their service appearance date, two months prior, we send them out a summons package which includes the actual summons, the questionnaire, some information based on the system, and a form that they can return confirming that they will be there, or requesting a postponement or requesting a disqualification with a envelope that they can return it in. CT Page 13651
Q Do you excuse some of these people that you notice?
A Yes.
Q And what criteria do you use to excuse them?
 A We use the Statutes and the disqualifications listed in — in the Statutes.
 Q Could you tell me what the disqualification criteria for your excusals are? In other words, what excuses will you accept to excuse somebody for jury service?
 A Well, there are — There are basically twelve that I accept, eleven of — Eleven of which are listed under Statutes 51-217 —
Q Um-hum.
 A (Continuing) — and another one that's listed under 51-217a.
 Q And when you said 51-217, are you specifically referring to 51-217C-1 as those eleven?
A That is correct.
 Q Now, Mr. Gayer, when you — you summon jurors for the Danbury Judicial District, where is it that you summon them from?
 A Well, the District is comprised of eight towns, Bethel, Brookfield, Danbury, New Fair — New Fairfield, Newtown, Redding, Ridgefield and Sherman.
 Q And those are the only towns that you summon jurors for — for this Judicial District?
A That is correct.
 Q And do you know how long it has been that, as the Jury Administrator, or the Jury Administrators have been summoning jurors from the towns — only the towns within the Judicial District? In other words, when did this practice start? CT Page 13652
 A I believe, according to the Statutes that I could extract, that it was effective for the Judicial District of Danbury on July 1st, 1978.
 Q So after July 1st of 1978 all jurors who came to serve in this Judicial District were from this Judicial District's towns?
 A I believe the actual effective date began with the September of that year.
 Q Very good. And, to determine how many jurors you will select from each town within the Judicial District of Danbury, how do you determine the percentages?
 A Well, the percentages are based on my records of qualification factors and if I apply those factors and then I come up with a figure that I have to reallocate to each town.
 Q Okay. But, what I'm getting at, Mr. Gayer, is — Well, let's say Danbury had 50% of the population of the district, would you summon 50% of the jurors from Danbury?
A We would build a master file of fif — 50% from Danbury.
 Q Okay. So basically, you — You — You — You summon the percentage of jurors that responds to the percentage of the town's population within the Judicial — Judicial District?
A That is correct.
Q And this is by Statute that you do this?
A That is correct.
 Q And by Statute as well, you use the United States Census to provide you with these population figures?
A That is correct.
 Q As the Jury Administrator, do you keep any records at all regarding raith or — race or ethnicity of any of the jurors who are summoned or who come to serve?
A No, I do not. CT Page 13653
 Q And when you notify 22,000 over the course of the year, '94 through '95, how many do you expect to need when you notice 22,000 people, or how many do you expect to get?
A Roughly 50%.
 Q And the other 50% either are excused or is postponed or for some reason don't come?
A or disqualified.
 Q And as the Jury Administrator, Mr. Gayer, what do you consider a jury array to be in Danbury?
 A I — The petition of array is the number of people that arrive for a particular day's session of jury selection.
Q And Danbury is on a one-day jury service system?
A That is correct.
Q And that's in accordance with 51-238a, is it?
A That's correct.
 Q And in a town like Dan — or a district like Danbury, where there are one-day — or in this particular Judicial District, where the length of term for services of a juror one day, you consider here the jury array to be the number of people who are here on any particular day?
A That is correct.
 Q And how many people do you ordinarily bring into Danbury on any particular day?
A We attempt to bring in approximately 45 every day.
 Q All right. And is there any adjustment in this number during the course of the year?
A Yes, there is.
Q Could you tell me how that works? CT Page 13654
 A Well, there's two types of adjustments. The Court may require supplement jurors to be called after the fact that we've summoned two months in advance. There may be some extraordinary circumstances where they need a hundred more a day, so we would then, in turn, try to get a hundred more, or the night before the — the jury session the jury poll officer in connection with the court, realizes that they do not need as many as are scheduled to appear, and they can cancel, almost certain, any amount that they determine.
Q This can be done by the jury clerk here herself?
A That's correct.
MR. COURTNEY: Excuse me one moment, Your Honor.
BY MR. COURTNEY:
 Q I know I asked you about the census, Mr. Gayer, but did I ask you was it specifically the 1990 United States Census that you have curr — you have summoned jurors for the court year '94-'95?
A That is correct.
MR. COURTNEY: Nothing further.
CROSS-EXAMINATION BY MS. GILBERT:
Q Good morning, Mr. Gayer.
A Good morning.
 Q Mr. Gayer, you testified as to qualifying factors. Do any of those take into consideration raith or — race or ethnicity?
A No, they do not.
MS. GILBERT: I have no que — other questions.
Thank you.
MR. COURTNEY: Nothing further, Your Honor. CT Page 13655
THE COURT: You can step down, sir.
Thank you.
 MR. COURTNEY: Your Honor, I did subpoena one of the clerks and Ms. French was not available when I subpoenaed him, but she has agreed to accept a subpoena this morning to testify briefly about the procedure that has gone on for today.
THE COURT: And?
MR. COURTNEY: So, I need her.
THE COURT: Well, get her.
MR. COURTNEY: Thank you.
 THE COURT: You got an inspes — Someone sitting back there can get her for you.
MR. COURTNEY: Ms. French.
THE COURT: Good morning.
THE WITNESS: Good morning.
 THE CLERK: Would you raise your right hand, please?
 Do you solemnly swear that the evidence you shall give concerning the case now in question, shall be the truth, the whole and nothing but the truth, so help you God?
THE WITNESS: Yes, I do.
 THE CLERK: Could you please state your name and business address, spelling your last name?
 THE WITNESS: Okay. My name is Beverly French, F-r-e-n-c-h, like the language. 146 —
THE COURT: You — Right. CT Page 13656
 THE WITNESS: 146 White Street, Danbury, Connecticut. Zero, sixty-eight, ten.
THE CLERK: Thank you.
THE WITNESS: Um-hum.
DIRECT EXAMINATION BY , MR. COURTNEY:
Q Good morning, Ms. French.
A Good morning.
 Q Could you just tell us for the record what it is that you do?
 A Yes, I am the Jury Pool Officer for the Danbury Superior Court.
Q And what are your duties?
 A When a person reports here for jury duty, I am the one in who's in charge of giving them their orientation, and keeping track of them, and doing their paper — all paperwork connected with them while they're here on jury duty.
Q And how long have you been doing this?
A Four and a half years.
Q Do you excuse people for jury service?
 A The answer to that is both yes and no. I excuse the very obvious persons for jury duty, which means someone who, perhaps is not a citizen or someone who is over seventy and is opting or taking the option to not serve at that particular time. They're not required to. Anyone that requires any type of a special for hardship or whatever, I go through a judge on their behalf.
 Q And how many jurors do you typically have in this judicial district on a particular day for a particular array?
A We have said we renew approximately forty-five. We do CT Page 13657 not call all forty-five in each day.
Q And for today?
A For today, I have forty-three people present.
 Q Are you involved at all with the summoning of these people?
A No, sir.
MR. COURTNEY: Nothing further.
MS. GILBERT: Good morning, Mrs. French.
THE WITNESS: Good morning.
MS. GILBERT: I have no questions.
THE COURT: All right.
 I have a few questions, but I don't think I'll ask them.
MS. GILBERT: Okay.
THE COURT: You're excused. Thank you.
THE WITNESS: Thank you.
MR. COURTNEY: Thanks, Bev.
THE WITNESS: Um-hum.
MR. COURTNEY: If I may, Your Honor?
THE COURT: If you may what?
 MR. COURTNEY: I'm through with my witnesses. I just have a —
THE COURT: Are you resting?
MR. COURTNEY: I'm resting, yes. CT Page 13658
 THE COURT: Do you have any evidence that you'd like to offer, Ms. State's Attorney?
MS. GILBERT: No, Your Honor. Thank you.
 THE COURT: Now, what would you like to do, Mr. Courtney?
MR. COURTNEY: Speak a few words.
THE COURT: Fine. Speak a few words.
 MR. COURTNEY: Your Honor, in general, I'm standing on my motion. I filed this motion in two other cases. It's been denied twice by other —
THE COURT: Are you surprised?
MR. COURTNEY: No.
THE COURT: I'm not either.
 MR. COURTNEY: At the trial level, I would be surprised, quite frankly, were it granted.
 THE COURT: I think amazed is probably a more accurate expression on this evidence.
 MR. COURTNEY: The first part of the motion is very simple, Your Honor. The case law is in there. I would say the strongest argument against the community being the array is that most of the later case law is more dictive than it is holding. The issue has never been up there since towns, and at that part — at that point we weren't using judicial districts.
 But, the Supreme Court is still calling the community the county, despite the fact that it has been the district court to this evidence since 1978.
 If the community is the county, then a person such as Mr. Faust would have a jury — a proper jury of some 20% minority. If the community is the district, then his jury would be, at best, 7% minority. That, I would suggest, is a substantial impact and I think a material CT Page 13659 departure from the law which are the requirements of the Connecticut and the United States Constitution.
 As to the second part of the motion, Your Honor, I do ask the Court to make the findings that I request to each array that we deal with, I think that's the only way I can make a record. There, I'm asking the Court to adopt a dissent in a case because the issue has not been raised. I realize that the Court will probably not do this, but I would ask the Court, at — at the least, to inquire without identifying to the — to the arrays, who it is that's asking for the information. How many claim to be Hispanic, how many claim to be white.
 The only other thing is, Judge, I have never had a written response from any State's Attorney to this motion, so I — I suppose Ms. Gilbert may have a few words, but I really can't respond to them, either.
 MS. GILBERT: Anything to provide any response, Your Honor, would be to give a frivolous motion credibility. I — I don't think it warrants any response. I'd ask Your Honor to deny it.
 MR. COURTNEY: Ms. Gilbert may call this motion frivolous, but there is a justice of our Supreme Court who says that we should consider using the whole state —
THE COURT: Which justice would that be?
MR. COURTNEY: Berdon.
THE COURT: Justice Berdon.
MR. COURTNEY: Yes, Your Honor.
THE COURT: Does that surprise you?
MR. COURTNEY: Does it surprise me?
THE COURT: Yes.
MR. COURTNEY: No.
THE COURT: Well, why don't we consider all of CT Page 13660 New England as well?
MR. COURTNEY: Pardon, Your Honor?
 THE COURT: Why don't we consider all of New England as well?
MR. COURTNEY: That would surprise me.
THE COURT: That would surprise you?
MR. COURTNEY: Yes.
 THE COURT: I think if he's faced with that question, he might answer it for you. Why don't you frame it in this next appeal you're going to take on this issue?
 As far as this Court is concerned, Mr. Courtney, I won't call your motion frivolous, but the thought has occurred to me. The motion is denied.
MR. COURTNEY: Your Honor, as to the second part?
THE COURT: What did I say, Mr. Courtney?
 MR. COURTNEY: Well, there's two parts to the motion.
THE COURT: What did I say, Mr. Courtney?
MR. COURTNEY: You said the motion is denied.
THE COURT: That's right.
 MR. COURTNEY: But as to the second part, will the Court —
THE COURT: The motion is denied, Mr. Courtney.
MR. COURTNEY: Your Honor, will the —
THE COURT: Mr. Co Courtney.
MR. COURTNEY: I understand — CT Page 13661
THE COURT: The motion is denied.
 MR. COURTNEY: Well, might — I have another request, though.
THE COURT: I'm sure you do.
 MR. COURTNEY: May I be permitted to make a record of the number of blacks and Hispanics of each day's array? Any procedure that the Court —
 THE COURT: Mr. Courtney, you could do anything you'd like, when it comes to making the record, I will supervise that. You will not do it in this case without this Court's permission at a specific time.
 The motion is denied. I'll hear no more of it, or any part of it. It's over. It's denied. It's gone.
Now, what's next?
 MR. COURTNEY: Your Honor, as to the bill of particulars, as I said, I'm not satisfied with it. I'd ask for a short recess just to — Because I got it just before we started here.
THE COURT: Do I have it?
 MS. GILBERT: I have the original for the clerk with a copy for the Court.
THE COURT: Would you take this back there, please?
 MS. GILBERT: Your Honor, I apologize. I only have the original and my copy. If, Your Honor, would like to look at that one and then I could take the clerk's original back.
 THE COURT: Why don't you bring me a copy when we come back in session?
MS. GILBERT: Thank you.
THE COURT: How long do you want? CT Page 13662
 MR. COURTNEY: Fifteen minutes, if the Court pleases?
THE COURT: Recess, please, sheriff?
THE COURT OFFICER: All rise, please.